IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRIMAR SYSTEMS INC, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>CISCO SYSTEMS INC, et al.,<br><br>    Defendants.<br>_____/ | No. C 13-01300 JSW<br><br>**CLAIM CONSTRUCTION ORDER** |

The Court has been presented with a technology tutorial and briefing leading up to a hearing pursuant to *Markman v. Westview Instruments, Inc.,* 517 U.S. 370 (1996).[1]  This Order construes the disputed claim terms selected by the parties, which appear in the patent at issue in this case: United States Patent No. 7,457,250 ("the '250 Patent") called "System for Communicating with Electronic Equipment."

## BACKGROUND

Plaintiff Chrimar Systems, Inc. ("Plaintiff") contends that Defendants Cisco Systems, Inc. et al. ("Defendants") infringe its patent.  Plaintiff's patent relates to communicating information about remotely located electronic equipment on a data network.

The Court shall address additional facts as necessary in the remainder of this Order.

//

//

---

[1] On January 28, 2015, Plaintiff filed a statement of recent decision to which Defendants object.  Because the Court does not rely upon Plaintiff's filing in reaching a decision in this matter, that objection is OVERRULED AS MOOT.

**ANALYSIS**

**A.     Legal Standard.**

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004). The interpretation of the scope and meaning of disputed terms in patent claims is a question of law and exclusively within the province of a court to decide. *Markman*, 517 U.S. at 372. The inquiry into the meaning of the claim terms is "an objective one." *Innova/Pure Water*, 381 F.3d at 1116. As a result, when a court construes disputed terms, it "looks to those sources available to the public that show what a person of skill in the art would have understood the disputed claim language to mean." *Id*. In most cases, a court's analysis will focus on three sources: the claims, the specification, and the prosecution history. *Markman v. Westview Instruments, Inc*., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). However, on occasion, it is appropriate to rely on extrinsic evidence regarding the relevant scientific principles, the meaning of technical terms, and the state of the art at the time at the time the patent issued. *Id.* at 979-81.

The starting point of the claim construction analysis is an examination of the specific claim language. A court's "claim construction analysis must begin and remain centered on the claim language itself, for that is the language that the patentee has chosen to particularly point out and distinctly claim the subject matter which the patentee regards as his invention." *Innova/Pure Water*, 381 F.3d at 1116 (internal quotations and citations omitted). Indeed, in the absence of an express intent to impart a novel meaning to a term, an inventor's chosen language is given its ordinary meaning. *York Prods., Inc. v. Cent. Tractor Farm & Family Center*, 99 F.3d 1568, 1572 (Fed. Cir. 1996). Thus, "[c]laim language generally carries the ordinary meaning of the words in their normal usage in the field of the invention." *Invitrogen Corp. v. Biocrest Mfg., L.P*., 327 F.3d 1364, 1367 (Fed. Cir. 2003); *see also Renishaw v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) (recognizing that "the claims define the scope of the right to exclude; the claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim"). A court's final construction, therefore, must

accord with the words chosen by the patentee to mete out the boundaries of the claimed invention.

The court should also look to intrinsic evidence, including the written description, the drawings, and the prosecution history, if included in the record, to provide context and clarification regarding the intended meaning of the claim terms. *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324-25 (Fed. Cir. 2002). The claims do not stand alone. Rather, "they are part of 'a fully integrated written instrument.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc) (quoting *Markman*, 52 F.3d at 978). The specification "may act as a sort of dictionary, which explains the invention and may define terms used in the claims." *Markman*, 52 F.3d at 979. The specification also can indicate whether the patentee intended to limit the scope of a claim, despite the use of seemingly broad claim language. *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001) (recognizing that when the specification "makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question").

Intent to limit the claims can be demonstrated in a number of ways. For example, if the patentee "acted as his own lexicographer," and clearly and precisely "set forth a definition of the disputed claim term in either the specification or prosecution history," a court will defer to that definition. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). In order to so limit the claims, "the patent applicant [must] set out the different meaning in the specification in a manner sufficient to give one of ordinary skill in the art notice of the change from ordinary meaning." *Innova/Pure Water*, 381 F.3d at 1117. In addition, a court will adopt an alternative meaning of a term "if the intrinsic evidence shows that the patentee distinguished that term from prior art on the basis of a particular embodiment, expressly disclaimed subject matter, or described a particular embodiment as important to the invention." *CCS Fitness*, 288 F.3d at 1367. For example, the presumption of ordinary meaning will give way where the "inventor has disavowed or disclaimed scope of coverage, by using words or expressions of

3

manifest exclusion or restriction, representing clear disavowal of claim scope." *Gemstar-TV Guide Int'l Inc. v. ITC*, 383 F.3d 1352, 1364 (Fed. Cir. 2004). The disclaimer in the prosecution history must be "clear and unmistakable." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325-26 (Fed. Cir. 2003). Likewise, the specification may be used to resolve ambiguity "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex*, 299 F.3d at 1325.

However, limitations from the specification (such as from the preferred embodiment) may not be read into the claims, absent the inventor's express intention to the contrary. *Id*. at 1326; *see also CCS Fitness*, 288 F.3d at 1366 ("[A] patentee need not 'describe in the specification every conceivable and possible future embodiment of his invention.'") (quoting *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001)). To protect against this result, a court's focus should remain on understanding how a person of ordinary skill in the art would understand the claim terms. *Phillips*, 415 F.3d at 1323. Additionally, "[w]hen consulting the specification to clarify the meaning of claim terms, court must take care not to import limitations into the claims from the specification." *Abbott Laboratories v. Sandoz, Inc.*, 566 F. 3d 1282, 1288 (Fed. Cir. 2009).

Similarly, the Federal Circuit has repeatedly cautioned courts against reading limitations into the claims based on a preferred embodiment: "although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to these embodiments." *Phillips*, 415 F. 3d at 1323. Courts have also "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Liebel-Flarsheim Co. v. Medrard, Inc.*, 358 F. 3d 898, 906 (Fed. Cir. 2004).

If the analysis of the intrinsic evidence fails to resolve any ambiguity in the claim language, a court then may turn to extrinsic evidence, such as expert declarations and testimony from the inventors. *Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1367 (Fed. Cir. 2003) ("When an analysis of *intrinsic* evidence resolves any ambiguity in a disputed claim term, it is

4

1 improper to rely on extrinsic evidence to contradict the meaning so ascertained.") (emphasis in
2 original). When considering extrinsic evidence, a court should take care not to use it to vary or
3 contradict the claim terms. Rather, extrinsic evidence is relied upon more appropriately to
4 assist in determining the meaning or scope of technical terms in the claims. *Vitronics Corp. v.*
5 *Conceptronic*, *Inc.*, 90 F.3d 1576, 1583-84 (Fed. Cir. 1996).

6 Dictionaries also may play a role in the determination of the ordinary and customary
7 meaning of a claim term. In *Phillips*, the Federal Circuit reiterated that "[d]ictionaries or
8 comparable sources are often useful to assist in understanding the commonly understood
9 meanings of words . . . ." *Phillips*, 415 F.3d at 1322. The *Phillips* court, however, also
10 admonished that district courts should be careful not to allow dictionary definitions to supplant
11 the inventor's understanding of the claimed subject matter. "The main problem with elevating
12 the dictionary to . . . prominence is that it focuses the inquiry on the abstract meaning of the
13 words rather than on the meaning of claim terms within in the context of the patent." *Id*. at
14 1321. Accordingly, dictionaries necessarily must play a role subordinate to the intrinsic
15 evidence.

16 In addition, a court has the discretion to rely upon prior art, whether or not cited in the
17 specification or the file history, but only when the meaning of the disputed terms cannot be
18 ascertained from a careful reading of the public record. *Vitronics*, 90 F.3d at 1584. Referring to
19 prior art may make it unnecessary to rely upon expert testimony, because prior art may be
20 indicative of what those skilled in the art generally understood certain terms to mean. *Id.*

21 **B.     Claim Construction.**
22     **1.     "Central module"**
23 The term "central module" appears in claims 1, 2, 12, 25, 53, and 61 of the '250 Patent.
24 Plaintiff argues that the term "central module" must be construed to mean "one or more
25 components that have been made part of centralized equipment of the star configuration data
26 network." Defendants, on the other hand, argue that the term must be construed to mean "a
27 centrally located self-contained hardware component or self-contained collection of hardware
28

5

components that functions separately from centralized network equipment to receive information transmitted by a remote module."

The Court finds that the intrinsic evidence does not fully support either construction. Specifically, the Court finds that the evidence does not support Plaintiff's argument that the central module must operate within a star configuration data network, or Defendants' argument that the central module must be self-contained and must be limited to receiving information, rather than transmitting information as well.

Accordingly, the Court construes "central module" as "a centrally located hardware component or components that receives information from or sends information to a remote module."

### 2. "Remote module"

The term "remote module" appears in claims 1, 23, 53, and 59 of the '250 Patent.

Plaintiff argues that the term "remote module" must be construed to mean "one or more components that have been made part of a remote object or piece of equipment." Defendants, on the other hand, argue that the term must be construed to mean "a remotely located self-contained hardware component or self-contained collection of hardware components that functions separately from the first [second] piece of equipment/object to transmit information to a central module."

At the *Markman* hearing, the parties agreed that the terms "central module" and "remote module" be construed together. For the same reasons stated above, the Court finds that neither parties' proposed construction is fully consistent with the evidence.

Accordingly, the Court construes "remote module" as "a remotely located hardware component or components that receives information from or sends information to a central module."

### 3. "A first [second] cable having wires therein connected between the central module and the first [second] piece of equipment"

The term "a first [second] cable having wires therein connected between the central module and the first [second] piece of equipment" appears in claim 1 of the '250 Patent.

6

Plaintiff argues that the term "a first [second] cable having wires therein connected between the central module and the first [second] piece of equipment" should be construed to mean "cabling connected between the central module and the first [second] remote piece of equipment that is separate from the cabling connected between the central module and the second [first] piece of equipment in a star network. The cabling may comprise a series of cables." Defendants do not object to Plaintiff's proposed construction, so long as the phrase "in a star network" is omitted.

Defendants argue that it would be improper to construe this term as requiring that the Patent operate in a star network. Defendants contend that the phrase "star network" is mentioned only one time in the intrinsic record, in a statement by the applicant following an examiner's interview. Defendants further point out that there is nothing in the Patent or the specifications regarding a star network. Plaintiff counters that a person of ordinary skill in the art would read the Patent and understand that it must function in a star network.

The Court agrees with Defendants and finds that the evidence does not support Plaintiff's proposed construction.

Accordingly, the Court construes "a first [second] cable having wires therein connected between the central module and the first [second] piece of equipment" as "cabling, which may be a series of cables, connected between the central module and the first [second] remote piece of equipment that is separate from the cabling connected between the central module and the second [first] piece of equipment."

### 4. "A separate cable connected between each object and the central module, each having a plurality of connectors therein"

The term "a separate cable connected between each object and the central module, each having a plurality of connectors therein" appears in claim 53 of the '250 Patent.

Plaintiff argues that the term "a separate cable connected between each object and the central module, each having a plurality of connectors therein" should be construed to mean "cabling connected between the central module and one remote object that is separate from the cabling connected between the central module and another remote object in a star network. The

7

1 cabling may comprise a series of cable segments." Defendants do not object to Plaintiff's
2 proposed construction, so long as the phrase "in a star network" is omitted.

For the same reasons set forth above, the Court agrees with Defendants.

Accordingly, the Court construes "a separate cable connected between each object and the central module, each having a plurality of connectors therein" as "cabling, which may be a series of cables, connected between the central module and one remote object that is separate from the cabling connected between the central module and another remote object."

### 5. "[Remote module] utilized in connection with the [central module] to alter a flow of current"

The term "[remote module] utilized in connection with the [central module] to alter a flow of current" appears in claims 1 and 53 of the '250 Patent.

Plaintiff argues that the term "[remote module] utilized in connection with the [central module] to alter a flow of current" should be construed to mean "a remote module acting together with the central module, to alter a flow of current." Defendants, on the other hand, argue that it should be construed to mean "remote module that, while connected to the central module, changes a current flow by impressing a low frequency signal on the wires of the cable."

At the *Markman* hearing, Plaintiff argued that this term should not be limited to low frequency signals because that phrase does not appear in the relevant claims. Plaintiff further contended that some signals may not have a frequency at all. Defendants responded that in the specifications it is made clear that any signal sent must be a low frequency signal, in order not to interfere with the high frequency signals sent by normal network traffic data. The Court agrees with Defendants. (*See, e.g.*, '250 Patent at 11:60-65; 12:3-6; 12:22-25.) The Court finds that the signals sent must be low frequency signals, in order that they not interfere with the normal high frequency network traffic data.

Accordingly, the Court construes the term "[remote module] utilized in connection with the [central module] to alter a flow of current" as "a remote module working with the central module to alter a flow of current by placing a low frequency signal on the wires."

8

### 6. "The altered current flow communicating information about the first [second] piece of equipment"

The term "the altered current flow communicating information about the first [second] piece of equipment" appears in claim 1 of the '250 Patent.

Plaintiff argues that the term "the altered current flow communicating information about the first [second] piece of equipment" should be construed to mean "the altered current flow carrying information about the [first or] second piece of equipment." Defendants, on the other hand, argue that it should be construed to mean "[information about the first [the second] piece of equipment] transmitted as low frequency changes in the current flow."

At the *Markman* hearing, the parties agreed that this construction hinged upon the Court's decision with respect to the construction of disputed claim term number five.

Accordingly, the Court construes the term "the altered current flow communicating information about the first [second] piece of equipment" as "the altered current flow communicates information about the first [the second] piece of equipment through low frequency changes."

### 7. "The altered current flow conveying information about an object"

The term "the altered current flow conveying information about an object" appears in claim 53 of the '250 Patent.

Plaintiff argues that the term "the altered current flow conveying information about an object" should be construed to mean "the altered current flow representing information about an object." Defendants, on the other hand, argue that it should be construed as "[information about an object] transmitted as low frequency changes in the current flow."

At the *Markman* hearing, the parties agreed that this construction also hinged upon the Court's decision with respect to the construction of disputed claim term number five.

Accordingly, the Court construes the term "the altered current flow communicating information about the first [second] piece of equipment" as "the altered current flow conveys information about an object through low frequency changes."

9

### 8. "alter a flow of current"

The term "alter a flow of current" appears in claims 1 and 53 of the '250 Patent.

Plaintiff argues that the term "alter a flow of current" should be construed to mean "change a loop current while it flows." Defendants argue that this term does not need construction. Alternatively, if it is to be construed, Defendants argue that it should be construed to mean "change a current flow by placing a low frequency signal on the wires of the cable."

At the *Markman* hearing, the parties agreed that this construction also hinged upon the Court's decision with respect to the construction of disputed claim term number five and that it should be construed consistently with disputed terms five, six, and seven.

Having construed disputed terms five, six, and seven, the Court concludes that "alter a flow of current" needs no further construction.

### 9. "Information about the first [second] piece of equipment/an object"

The term "information about the first [second] piece of equipment/an object" appears in claims 1 and 53 of the '250 Patent.

Plaintiff argues that the term "information about the first [second] piece of equipment/an object" should be construed to mean "predetermined information about each piece of equipment or object." Defendants, on the other hand, argue that it should be construed to mean "information sufficient to identify or distinguish the first [the second] piece of equipment from another piece of equipment/an object from another object connected to the network."

The Court proposed the following construction: "information sufficient to, but not necessarily limited to, identify or distinguish each piece of equipment or object connected to the network." At the *Markman* hearing, Plaintiff suggested that the word "each" be replaced by the phrase "the first and the second." The Court agrees that this formulation is more consistent with the words of the claim itself and avoids unnecessary ambiguity. Plaintiff also argued that the Court should not include the phrase "connected to the network" or "physically connected to the network" because they are redundant of the language of the claim itself. If the Court were to adopt its proposed construction, the claim would read, for example: the altered current flow communicating information sufficient to, but not necessarily limited to, identify or distinguish

10

the first piece of equipment or object connected to the network to the central module while the first piece of equipment is physically connected to the network. (*See* '250 Patent at 17:12-15.) The Court agrees with Plaintiff that this construction creates an unwarranted redundancy.

Accordingly, the Court construes "information about the first [second] piece of equipment/an object" as "information sufficient to, but not necessarily limited to, identify or distinguish the first and the second piece of equipment or object."

## CONCLUSION

Based on the analysis set forth above, the Court adopts the foregoing constructions of the disputed terms. The parties are ORDERED to submit a further joint case management report pursuant to Patent Standing Order ¶ 13 by no later than April 3, 2015.

**IT IS SO ORDERED.**

Dated: March 18, 2015

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE