Courtland L. Reichman (SBN 268873)
**McKool Smith Hennigan P.C.**
255 Shoreline Drive, Suite 510
Redwood Shores, CA 94065
Telephone: (650) 394-1401
Facsimile: (650) 394-1422
creichman@mckoolsmithhennigan.com

Robert Auchter *(PRO HAC VICE)*
**McKool Smith P.C.**
1999 K Street NW, Suite 600
Washington, DC 20006
Telephone: (202) 370-8300
Fax: (202) 370-8344
rauchter@mckoolsmith.com

ADDITIONAL COUNSEL LISTED ON
SIGNATURE PAGE

*Attorneys for Plaintiffs*
*ChriMar Systems Inc. d/b/a CMS Technologies*
*and ChriMar Holding Company, LLC*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| ChriMar Systems Inc. d/b/a CMS Technologies and ChriMar Holding Company, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> Cisco Systems Inc., Linksys LLC, Hewlett-Packard Co., <br><br> Defendants. | Case No.  4:13-cv-1300-JSW <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT** <br><br> Hearing:  June 24, 2016 <br> Time:  9:00 am <br> Courtroom:  5, 2nd Floor <br> Judge:  Honorable Jeffrey S. White <br> Magistrate Judge:  Maria-Elena James |

McKool Smith Hennigan P.C.
A Professional Corporation · Attorneys
Redwood Shores, CA

- REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED -

McKool Smith Hennigan P.C.
A Professional Corporation · Attorneys
Redwood Shores, CA

## PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

TO ALL PARTIES AND THEIR COUNSEL OF RECORD: PLEASE TAKE NOTICE THAT on June 24, 2016 at 9:00 am or as soon thereafter as this matter may be heard before the honorable Jeffrey S. White, Plaintiffs ChriMar Systems Inc. d/b/a CMS Technologies and ChriMar Holding Company, LLC (collectively, "ChriMar") will and hereby do move for an order granting ChriMar summary judgment pursuant to Federal Rules of Civil Procedure 56.

Plaintiffs' Motion is based on and supported by the memorandum of points and authorities contained herein, the Declaration of Brandon M. Jordan submitted concurrently herewith, all other pleadings and papers on file in this action, and all other evidence, information, and argument that has been or will be presented to the Court in connection with this Motion.

## STATEMENT OF RELIEF REQUESTED

ChriMar respectfully requests that this Court grant summary judgment against: Cisco's counterclaim Count III (Declaration of patent unenforceability due to unclean hands), Count IV (Breach of Contract), Count V (Monopolization over Ethernet Technologies Market in Violation of Section 2 of the Sherman Act), Count VI (Unfair Business Practices Under Section 17200 of California Business & Professions Code), Count VII (Fraud), and Count VII [sic][1] (Inequitable Conduct), and Cisco's affirmative defenses of Estoppel (Fourth), Unclean hands (Fifth), Waiver (Sixth), License/Release (Seventh), Lack of Subject Matter Jurisdiction (Eighth), Patent Misuse (Ninth), and Inequitable Conduct (Fourteenth), as well as HP's counterclaim Count II (Declaration of patent unenforceability due to unclean hands), Count III (Breach of Contract), and Count IV (Inequitable Conduct) and affirmative defenses of Estoppel (Fourth), Unclean hands (Fifth), Waiver (Sixth), Implied License (Seventh), Lack of Subject Matter Jurisdiction (Eighth), Patent Misuse (Ninth), and Inequitable Conduct (Fourteenth). ChriMar also seeks summary determination that Cisco satisfies the knowledge and intent requirements of indirect infringement.

---

[1] Cisco has two separate counterclaims both numbered "VII." *See* Dkt. 369 at ¶¶ 113-126.

1

Dated: April 29, 2016

Respectfully submitted,

McKool Smith P.C.

*/s/ Brandon Jordan*
Brandon Jordan

Courtland L. Reichman
McKool Smith Hennigan P.C.
255 Shoreline Drive, Suite 510
Redwood Shores, CA 94065
Telephone: (650)-394-1401
Facsimile: (650)-394-1422

Robert Auchter *(PRO HAC VICE)*
Benjamin Levi *(PRO HAC VICE)*
Dirk D. Thomas *(PRO HAC VICE)*
Brandon M. Jordan *(PRO HAC VICE)*
Christopher J. Mierzejewski *(PRO HAC VICE)*
McKool Smith P.C.
1999 K Street NW, Suite 600
Washington, DC 20006
Telephone: (202) 370-8300
Fax: (202) 370-8344
rauchter@mckoolsmith.com
blevi@mckoolsmith.com
dthomas@mckoolsmith.com
bjordan@mckoolsmith.com
cmierzejewski@mckoolsmith.com

*Attorneys for Plaintiffs ChriMar Systems Inc. d/b/a*
*CMS Technologies and ChriMar*
*Holding Company, LLC*

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
Case No. 4:13-cv-1300-JSW

- REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED -

Courtland L. Reichman
**McKool Smith Hennigan P.C.**
255 Shoreline Drive, Suite 510
Redwood Shores, CA 94065
Telephone: (650)-394-1401
Facsimile: (650)-394-1422
creichman@mckoolsmithhennigan.com

Robert Auchter *(PRO HAC VICE)*
**McKool Smith P.C.**
1999 K Street NW, Suite 600
Washington, DC 20006
Telephone: (202) 370-8300
Fax: (202) 370-8344
rauchter@mckoolsmith.com

ADDITIONAL COUNSEL LISTED ON
SIGNATURE PAGE

*Attorneys for Plaintiffs*
*ChriMar Systems Inc. d/b/a CMS Technologies*
*and ChriMar Holding Company, LLC*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| ChriMar Systems Inc. d/b/a CMS Technologies and ChriMar Holding Company, LLC,<br><br>    Plaintiffs,<br><br>v.<br><br>Cisco Systems Inc., Linksys LLC, Hewlett-Packard Co.,<br><br>    Defendants. | Case No.  4:13-cv-1300-JSW<br><br>**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing:  June 24, 2016<br>Time:   9:00 am<br>Courtroom: 5, 2nd Floor<br>Judge:   Honorable Jeffrey S. White<br>Magistrate Judge:  Maria-Elena James |

McKool Smith Hennigan P.C.
A Professional Corporation · Attorneys
Redwood Shores, CA

- REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED -

## **TABLE OF CONTENTS**

I.      Introduction ........................................................................................................1

II.     Legal Standard ...................................................................................................3

III.    Summary Judgment on Defendants' IEEE-Related Counterclaims and Affirmative Defenses Is Warranted. .....................................................................................4

       A.      Defendants' Cannot Prevail on Their IEEE-Related Counterclaims and Affirmative Defenses Under *Rambus*. ....................................................5

       B.      Summary Judgment Is Proper Because Defendants Cannot Establish That the IEEE Bylaws and Related Documents Imposed a Duty of Disclosure. ............9

             1.      Interpretation of the IEEE Rules is a Matter of Law ...............................9

             2.      Imposition of a Contractual Duty Requires Sufficiently Definite Terms and Requires an Agreement to Abide by Those Terms ...............10

             3.      The IEEE Imposed No Duty of Disclosure on ChriMar. ........................10

             4.      ChriMar Did Not Agree to a Duty to Disclose. .......................................13

       C.      Summary Judgment Is Proper Against Defendants' Patent Misuse Affirmative Defense ...............................................................................15

IV.    Summary Judgment Should be Granted as to Cisco's IEEE-Related Counterclaims and Affirmative Defenses Because they are Time-Barred. ......................15

       A.      Because Cisco's Breach of Contract Counterclaims Accrued in 2000 and No Later than 2005, Claims Asserted After 2009 are Time-Barred. ...............16

       B.      Cisco's Unfair Business Practices Counterclaims Accrued No Later Than 2005, and Claims Filed after 2009 Are Time-Barred. ...............................17

       C.      Because Cisco's Monopolization Counterclaim Accrued in 2001, Claims After 2005 Are Time-Barred. ...........................................................17

       D.      Cisco's Fraud Counterclaim Accrued in 2000, Rendering any Claim Filed after 2003 Outside the Statute of Limitations. .........................................19

V.     Summary Judgment Against Cisco's Monopolization counterclaim is Appropriate also because chrimar does not have market power. .............................................20

VI.    Summary Judgment on Cisco's "License / Release" Defense is Appropriate ...............22

VII.   Because Cisco Satisfies the Knowledge and Intent Requirements of Indirect Infringement, Summary Judgment is Warranted. ......................................................23

i

McKool Smith Hennigan P.C.
A Professional Corporation · Attorneys
Redwood Shores, CA

- REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED -

VIII.  Summary Judgment of No Inequitable Conduct is Appropriate.........................................25

    A.    Mr. Boenke's Alleged Co-Inventorship Is Not Material to Patentability..............26

    B.    The Evidence in This Case Does Not "Require a Finding of Deceitful Intent" .................................................................................................................27

IX.  Conclusion .................................................................................................................30

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**McKool Smith Hennigan P.C.**
**A Professional Corporation • Attorneys**
**Redwood Shores, CA**

- REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED -

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................................................3

*Apple, Inc. v. Motorola Mobility, Inc.*,
    886 F. Supp. 2d 1061 (W.D. Wis. 2012) ...............................................................22

*Auxilium Pharms., Inc. v. Watson Labs., Inc.*,
    No. 12-3084 (JLL), 2014 U.S. Dist. LEXIS 184032 (D.N.J. Dec. 16, 2014).........27

*Beard v. Pennington*,
    No. 14-cv-03128-YGR (PR), 2015 U.S. Dist. LEXIS 156810 (N.D. Cal. Nov.
    19, 2015) .................................................................................................................16

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ................................................................................................3

*ChriMar et al. v. Alcatel-Lucent et al.*,
    613-cv-880 (E.D. Tex.) .......................................................................................7, 27

*Commil USA, LLC v. Cisco Systems*,
    575 U.S. __, 135 S. Ct. 1920 (2015) ....................................................................24

*Daria v. Hurly*,
    No. 15-cv-00970-DMR, 2015 U.S. Dist. LEXIS 134343 (N.D. Cal. Oct. 1,
    2015) .................................................................................................................16, 19

*Diamond Scientific Co. v. Ambico, Inc.*,
    848 F.2d 1220 (Fed. Cir. 1988) .............................................................................28

*Eichman v. Fotomat Corp.*,
    880 F.2d 149 (9th Cir. 1989) ..............................................................................2, 20

*Finley v. Dynamic Recovery Solutions LLC*,
    No. 14-cv-04028-THE, 2015 U.S. Dist. LEXIS 134305 (N.D. Cal. Sept. 30,
    2015) .......................................................................................................................16

*Global-Tech Appliances, Inc. v. SEB S.A*,
    563 U.S. 754 (2011) ..........................................................................................24, 26

*Greenberg v. Riversource Life Ins. Co.*,
    No. C 12-00552 WHA, 2012 U.S. Dist. LEXIS 111575 (N.D. Cal. Aug. 8,
    2012) .......................................................................................................................16

McKool Smith Hennigan P.C.
A Professional Corporation • Attorneys
Redwood Shores, CA

- REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED -

*Hynix Semiconductor Inc. v. Rambus Inc.*,
    441 F. Supp. 2d 1066 (N.D. Cal. 2006) ..................................................9, 10, 14

*Hynix Semiconductor, Inc. v. Rambus, Inc.*,
    609 F. Supp. 2d 988 (N.D. Cal. 2009) ..........................................................15, 23

*Image Tech. Servs. v. Eastman Kodak Co.*,
    125 F.3d 1195 (N.D. Cal. 1997) ......................................................................21

*Ind. Forge, LLC v. Miller Veneers, Inc.*,
    736 F. Supp. 2d 1201 (S.D. Ind. 2010) ...........................................................27

*Kauffman-Stachowiak v. Omni Hotels Mgmt. Corp.*,
    No. 15-cv-05186-WHO, 2015 U.S. Dist. LEXIS 169077 (N.D. Cal. Dec. 16,
    2015) .................................................................................................................16

*LocusPoint Networks, LLC v. D.T.V. LLC*,
    No. 14-cv-01278-JSC, 2015 U.S. Dist. LEXIS 113356 (N.D. Cal. Aug. 26,
    2015) ...................................................................................................................3

*MedImmune, Inc. v. Genentech, Inc.*,
    549 U.S. 118 (2007).........................................................................................28

*Mercy-Peninsula Ambulance, Inc. v. County of San Mateo*,
    791 F.2d 755 (9th Cir. 1986) ...........................................................................22

*name.space, Inc. v. Internet Corp. for Assigned Names & Numbers*,
    795 F.3d 1124 (9th Cir. 2015) ..........................................................................22

*Nissan Fire & Mar. Ins. Co., Ltd. v. Fritz Cos.*,
    210 F.3d 1099 (9th Cir. 2000) ............................................................................4

*Olde Monmouth Stock Transfer Co. v. Depository Trust & Clearing Corp.*,
    485 F. Supp. 2d 387 (S.D.N.Y. 2007)..............................................................22

*Portney v. CIBA Vision Corp.*,
    593 F. Supp. 2d 1120 (C.D. Cal. 2008) ...........................................................22

*Rambus Inc. v. Federal Trade Comm'n*,
    522 F.3d 456 (D.C. Cir. 2008)................................................................. *passim*

*Rambus Inc. v. Infineon Techs. AG*,
    318 F.3d 1081 (Fed. Cir. 2003)....................................................................9, 10

*Rebel Oil Co., Inc. v. Atlantic Richfield, Co.*,
    51 F.3d 1421 (9th Cir. 1995) ...........................................................................21

McKool Smith Hennigan P.C.
A Professional Corporation • Attorneys
Redwood Shores, CA

- REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED -

*Rivera v. BAC Home Loans Servicing, L.P.*,
  756 F. Supp. 2d 1193 (N.D. Cal. 2010) ..................................................19, 20

*Ryan v. Microsoft Corp.*,
  No. 14-CV-04634-LHK, 2015 U.S. Dist. LEXIS 158944 (N.D. Cal. Nov. 23,
  2015) ..........................................................................................................17, 18

*Therasense. Therasense, Inc. v. Becton, Dickinson & Co.*,
  649 F.3d 1276 (Fed. Cir. 2011).............................................................. *passim*

*Transphase Sys. v. Southern Cal. Edison Co.*,
  839 F. Supp. 711 (C.D. Cal. 1993) ..................................................................22

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) (en banc) (*per curiam*)........................................5

*Winbound Electronics Corp. v. Int'l Trade Comm'n*,
  262 F.3d 1363 (Fed. Cir. 2001)...................................................................3, 27

*Winet v. Price*,
  4 Cal. App. 4th 1159 (Cal. App. 4th 1992)........................................................9

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  401 U.S. 321 (1971)..........................................................................................18

**Statutes**

15 U.S.C. § 15b................................................................................................18

35 U.S.C. § 116(b)............................................................................................27

Cal. Bus. & Prof. Code § 17208 .....................................................................17

Cal. Code Civ. Proc. § 337(1)..........................................................................16

Section 17200 of California Business & Professions Code...............1, 4, 5, 17

**Other Authorities**

Fed. R. Civ. P. 56(a) ..........................................................................................3

*Webster's New World^TM College Dictionary* (4th Ed. 2000) at 283 ...............12

McKool Smith Hennigan P.C.
A Professional Corporation • Attorneys
Redwood Shores, CA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED -

# I.    INTRODUCTION

Plaintiffs ChriMar Systems, Inc. d/b/a CMS Technologies and ChriMar Holding Company, LLC ("ChriMar") hereby presents its motion for summary judgment as to Defendants Cisco Systems, Inc., Linksys LLC (collectively "Cisco"), and Hewlett-Packard Corporation's ("HP") (Cisco and HP collectively "Defendants") counterclaims and affirmative defenses, as well as the knowledge and intent requirements of indirect infringement as to Cisco. Summary judgment is warranted for several reasons.

As set forth herein, the lynchpin of many of Defendants' counterclaims and affirmative defenses is their contention that ChriMar failed to satisfy its supposed obligations to the IEEE, hereinafter referred to as the "IEEE-Related Counterclaims and Affirmative Defenses."[2] These counterclaims and affirmative defenses cannot survive summary judgment because: (1) Defendants' cannot show an "anticompetitive effect" under the seminal case of *Rambus Inc. v. Federal Trade Comm'n*, 522 F.3d 456 (D.C. Cir. 2008); (2) the IEEE imposed no duty on ChriMar to disclose intellectual property to the IEEE as a matter of law; and (3) even if a duty could have existed, ChriMar expressly refused to accept such a contractual duty.

Moreover, as to Cisco, Cisco's IEEE-Related Counterclaims and Affirmative Defenses for breach of contract, unfair business practices, monopolization, and fraud, which are based on

---

[2]   As to IEEE-related claims, ChriMar's motion pertains to Cisco and HP's counterclaims and defenses that are based on ChriMar's alleged acts and omissions before the IEEE. Specifically, they are Cisco counterclaim Count III (Declaration of patent unenforceability due to unclean hands), Count IV (Breach of Contract), Count V (Monopolization over Ethernet Technologies Market in Violation of Section 2 of the Sherman Act), Count VI (Unfair Business Practices Under Section 17200 of California Business & Professions Code), and Count VII (Fraud), and Cisco's affirmative defenses of Estoppel (Fourth), Unclean hands (Fifth), Waiver (Sixth), Implied Patent Misuse (Ninth). As to HP, this aspect of the motion pertains to counterclaim Count II (Declaration of patent unenforceability due to unclean hands) and Count III (Breach of Contract) and affirmative defenses of Estoppel (Fourth), Unclean hands (Fifth), Waiver (Sixth), Implied License (Seventh), Lack of Subject Matter Jurisdiction (Eighth), and Patent Misuse (Ninth). The foregoing counterclaims and affirmative defenses are collectively referred to herein as "the IEEE-Related Counterclaims and Affirmative Defenses." ▮▮▮▮▮▮▮ *See* April 29, 2016 Declaration of B. Jordan at Ex. A, HP's November 23, 2015, Corrected Objections and Responses to ChriMar's Third Set of Interrogatories, at 20-21 (▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.") [hereinafter "Ex." refers to exhibits of the April 29, 2016 Declaration of B. Jordan filed herewith].

McKool Smith Hennigan P.C.
A Professional Corporation · Attorneys
Redwood Shores, CA

- REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED -

1   ChriMar's alleged failure to disclose U.S. Patent No. 7,457,250 ("the '250 patent") to the IEEE,

2   are time-barred—even if those claims accrued as late as 2005. Cisco simply failed to assert those

3   counterclaims within the applicable statute of limitations.

4       As a subset of Defendants' IEEE-Related Counterclaims and Affirmative Defenses,

5   Cisco also asserts a monopolization counterclaim under Section 2 of the Sherman Act that cannot

6   survive summary judgment.  Cisco, a large technology company that boasts over 70,000

7   employees with over $26 Billion in annual domestic revenue,[3] contends that ChriMar, a small

8   company with two employees located in Farmington Hills, Michigan, is a monopolist and that

9   ChriMar's alleged conduct has caused Cisco to suffer antitrust injury.  Cisco's claims pass

10  neither the "red-face" test nor the requirement that Cisco establish direct or circumstantial

11  evidence of "market power."  *Eichman v. Fotomat Corp.*, 880 F.2d 149, 163 (9th Cir. 1989).

12      Additionally Cisco's Seventh Affirmative Defense of "License / Release" relies on the

13  2005 agreement between Cisco and ChriMar as the basis to contend that Cisco has a license to

14  the '250 patent, thus, so does Cisco's Eight Affirmative Defense of "Lack of Subject Matter

15  Jurisdiction."  Such a claim fails as a matter of law because

16  

17  

18      Appurtenant to Cisco's so-called "license" defense, the Court should find on summary

19  judgment that Cisco satisfies the knowledge and intent requirements of indirect infringement.

20  Cisco's pre-suit knowledge of the asserted patent—particularly Cisco's negotiation of a covenant

21  not to sue with ChriMar as to any patent that may issue from the '708 application (including the

22  '250 patent)—proves that Cisco knowingly and intentionally infringed.

23      Last, Defendants' inequitable conduct allegations should be rejected on summary

24  judgment because they are predicated on the notion that ChriMar intended to hide Mr. Boenke as

25  an alleged co-inventor from the patent office while ChriMar indisputably owns all intellectual

26  

---

27  [3]Cisco 2015 Annual Report at 1, 119, available at http://www.cisco.com/c/en/us/about/annual-reports.html.

28

- REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED -

property rights that Mr. Boenke could possibly have.  Defendants' theory that ChriMar acted to cover-up an inventorship controversy is completely nonsensical, particularly in view of the fact that "[i]ncorrect inventorship is a technical defect in a patent that may be easily curable." *Winbound Electronics Corp. v. Int'l Trade Comm'n*, 262 F.3d 1363, 1371 (Fed. Cir. 2001). Defendants' theory that ChriMar intended to deceive the Patent Office is simply not the only reasonable inference in view of the evidence, and must fail in light of *Therasense*.  *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290-1291 (Fed. Cir. 2011)

For the foregoing reasons and as set forth in detail below, the Court should grant Plaintiffs' motion.

## II.   LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery, and affidavits demonstrate that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment must be granted where there is not "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

"When the party moving for summary judgment does not bear the burden of proof at trial (usually the defendant), the party has the burden of producing evidence negating an essential element of each claim on which it seeks judgment or showing that the opposing party cannot produce evidence sufficient to satisfy her burden of proof at trial." *LocusPoint Networks, LLC v. D.T.V. LLC*, No. 14-cv-01278-JSC, 2015 U.S. Dist. LEXIS 113356, at *18 (N.D. Cal. Aug. 26, 2015) (citing *Nissan Fire & Mar. Ins. Co., Ltd. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000)). Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is a genuine issue for trial. If the nonmoving party fails to make this showing, "the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To survive a motion for summary judgment, therefore, Defendants must produce sufficient evidence to establish the existence of every essential element of their counterclaims and affirmative

McKool Smith Hennigan P.C.
A Professional Corporation • Attorneys
Redwood Shores, CA

- REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED -

defenses for which ChriMar seeks summary judgment. *See id.* Thus, where ChriMar points to Defendants' inability to prove an essential element of its counterclaims and affirmative defenses, the burden is on Defendants to produce sufficient evidence demonstrating that they in fact can do so. *See Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co.*, 210 F.3d 1099, 1103 (9th Cir. 2000).

## III. SUMMARY JUDGMENT ON DEFENDANTS' IEEE-RELATED COUNTERCLAIMS AND AFFIRMATIVE DEFENSES IS WARRANTED.

This action was initiated on October 31, 2011 by ChriMar against Defendants and others for infringement of the '250 patent in a lawsuit filed in the District Court for the District of Delaware, and was subsequently transferred to this District.[4]

On January 13, 2012, Cisco filed its Answer and Counterclaims against ChriMar, asserting affirmative defenses of estoppel, unclean hands, waiver, license, and patent misuse and counterclaims for a declaration of patent unenforceability due to unclean hands, breach of contract, monopolization under Section 2 of the Sherman Act, and unfair business practices under Section 17200 of California Business & Professions Code.[5] Cisco based each of those affirmative defenses and counterclaims on ChriMar's failure to disclose to the IEEE the existence of the '708 application at meetings in 2000[6] and 2005 related to the standardization of Power-over-Ethernet ("PoE") technology.[7] Cisco also grounded those counterclaims and affirmative defenses in the Letter of Assurance ChriMar submitted to the IEEE in 2001 in which it disclosed ChriMar's U.S. Patent No. 5,406,260 ("the '260 patent") but not the unrelated '708 application.[8] In Cisco's December 26, 2012 First Amended Counterclaims, Cisco would first raise the counterclaim of fraud, which was similarly grounded in ChriMar's alleged nondisclosure of the application that later issued as the '250 patent.[9]

---

[4] *See, e.g.,* Case No. 11-1050 (D. Del.), Dkt. No. 1 (Complaint); *Id.* at Dkt. No. 83 (Order transferring case).
[5] Case No. 11-1050 (D. Del.), Dkt. No. 30 (Cisco's Answer and Counterclaims) at ¶¶ 6–27, 29–34, 45–81.
[6] The '708 application was not even filed until September 23, 2003. U.S. Patent No. 7,457,250.
[7] *Id.*
[8] *Id.*
[9] Case No. 11-1050 (D. Del.), Dkt. No. 51 (Cisco's Amended Counterclaims) at ¶¶ 85–91.

McKool Smith Hennigan P.C.
A Professional Corporation • Attorneys
Redwood Shores, CA

- REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED -

On December 26, 2012, HP filed its Answer, Affirmative Defenses, and Counterclaims against ChriMar, asserting affirmative defenses of estoppel, unclean hands, waiver, license (implied), and patent misuse and counterclaims for a declaration of patent unenforceability due to unclean hands, breach of contract, monopolization and attempted monopolization under Section 2 of the Sherman Act, and unfair business practices under Section 17200 of California Business & Professions Code, alleging that ChriMar had a duty and failed to disclose to the IEEE the '708 application in 2000, 2001, and 2005.[10] Thus, the counterclaims and affirmative defenses that are the subject of this Motion, which are all grounded in ChriMar's alleged misconduct from 2000, 2001, and 2005, were not asserted by Defendants until 2012.

### A. Defendants' Cannot Prevail on Their IEEE-Related Counterclaims and Affirmative Defenses Under *Rambus*.

Defendants do not present real evidence that the IEEE would have actually adopted a different technology into the 802.3af standard if ChriMar had disclosed the '250 patent or '708 application, and therefore Defendants' cannot suffer harm under preeminent case law relating to standards-setting activities.

The seminal decision in *Rambus Inc. v. Federal Trade Comm'n*, 522 F.3d 456 (D.C. Cir. 2008) precludes Defendants' IEEE-Related Counterclaims and Affirmative Defenses.  The *Rambus* Court reiterated two controlling principles:

> First, 'to be condemned as exclusionary, a monopolist's act must have "anticompetitive effect." That is, it must harm the competitive *process* and thereby harm consumers. In contrast, harm to one or more *competitors* will not suffice.' Second, it is the antitrust plaintiff … that bears the burden of proving the anticompetitive effect of the monopolist's conduct.

*Rambus*, 522 F.3d at 463 (*quoting* and *citing United States v. Microsoft Corp.*, 253 F.3d 34, 58–59 (D.C. Cir. 2001) (en banc) (*per curiam*)) (emphases in *Microsoft*). The Court then turned to the record to determine whether the FTC had established that *Rambus*'s conduct had harmed the competitive process. According to the FTC, Rambus had harmed the competitive process by

---

[10] Case No. 11-1050 (D. Del.), Dkt. No. 52 (HP's Answer and Counterclaims) at ¶¶ 6–26, 28–34, 44–102.  HP has withdrawn its counterclaims of monopolization and attempted monopolization under Section 2 of the Sherman Act, and unfair business practices under Section 17200 of California Business & Professions Code.  Dkt No. 353.

McKool Smith Hennigan P.C.
A Professional Corporation • Attorneys
Redwood Shores, CA

- REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED -

failing to disclose to JEDEC (the standard-setting organization at issue in the case) that it had patent interests in the technology being considered by JEDEC. *Id.* at 461. More specifically, the FTC determined that Rambus's failure to disclose its patent rights in the technology being considered prevented JEDEC from either adopting an alternative, non-proprietary standard or from requiring a RAND commitment from Rambus when standardizing its technology. *Id.* at 458, 462.

The Court first examined and disposed of the FTC's second alternative grounds for its finding of monopolization—that Rambus's anticompetitive conduct prevented JEDEC from requiring a RAND commitment. The Court found that "deceit merely enabling a monopolist to charge higher prices than it otherwise could have charged would not in itself constitute monopolization." *Id.* at 459. *See id.* at 466 (holding that loss of the "opportunity to secure a RAND commitment from Rambus ... is not a harm to competition from alternative technologies in the relevant markets"). *See also id.* at 467 (finding that "JEDEC's loss of an opportunity to seek favorable licensing terms is not as such an antitrust harm"). According to the Court, "had JEDEC limited Rambus to reasonable royalties and required it to provide licenses on a nondiscriminatory basis, we would expect *less* competition from alternative technologies, not more; high prices and constrained output tend to attract competitors, not to repel them." *Id.* at 466 (emphasis in original). Thus, a standard-setting organization's lost opportunity to seek favorable licensing terms by requiring RAND rates due to alleged nondisclosure of patent rights does not have an "anticompetitive effect" and ***necessarily cannot constitute monopolization***.

The FTC's finding of liability for monopolization, therefore, hinged on whether JEDEC would have selected an alternative, non-proprietary technology for standardization if it had been aware of Rambus's intellectual property rights. *See id.* ("'[A]n antitrust plaintiff must establish that the standard-setting organization would not have adopted the standard in question but for the misrepresentation or omission.'") (quoting 2 Hovenkamp *et al.*, IP & Antitrust § 35.5 at 35–45 (Supp. 2008)) ("Hovenkamp"). Accordingly, "if JEDEC, in the world that would have existed but for Rambus's deception, would have standardized the very same technologies, Rambus's

McKool Smith Hennigan P.C.
A Professional Corporation · Attorneys
Redwood Shores, CA

- REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED -

1    alleged deception cannot be said to have had an effect on competition in violation of the antitrust

2    laws." *Rambus*, 522 F.3d at 466-67. Because the FTC had "expressly left open the likelihood that

3    JEDEC would have standardized Rambus's technologies *even if Rambus had disclosed* its

4    intellectual property," the FTC "failed to demonstrate that Rambus's conduct was exclusionary,

5    and thus to establish its claim that Rambus unlawfully monopolized the relevant markets." *Id.* at

6    466, 467 (emphasis in original).

7            Here, as reaffirmed by the *Rambus* Court, to prevail on its antitrust claims, Defendants

8    bear the burden of proving the anticompetitive effect of ChriMar's conduct. *See Rambus*, 522

9    F.3d at 463 (*citing Microsoft*, 253 F.3d at 58–59).  Defendants allege that "had the IEEE known

10   about the '250 Patent or corresponding patent applications and ChriMar's positions regarding the

11   same, the IEEE would have incorporated one or more of the existing and known viable

12   alternative technologies . . . into the IEEE 802.3af and IEEE 802.3at amendments to the IEEE

13   802.3 standard instead of the functionalities that ChriMar contends infringe the '250 Patent."

14   Dkt. 369 at ¶ 39 ("Cisco's Counterclaims"); Dkt. 373 at ¶ 38 ("HP's Counterclaims").  To the

15   contrary, Defendants cannot show that—even if ChriMar had provided a blanket Letter of

16   Assurance—the IEEE would have adopted a different standard.  While Defendants identified a

17   number of technologies that had been proposed by other companies and considered by the IEEE

18   during the standardization process, Defendants argue only that those technologies were "viable

19   alternatives" and that "ChriMar's purported technology is not inherently better in terms of

20   technical merit than any of these alternatives." Cisco's Counterclaims at ¶ 38; HP's

21   Counterclaims at ¶ 37. Defendants do not indicate that those alternative technologies were

22   themselves inherently superior than ChriMar's technology and, therefore, Defendants—just as

23   the FTC had done in *Rambus*—"expressly left open the likelihood that [IEEE] would have

24   standardized [ChriMar's] technologies *even if [ChriMar] had disclosed* its intellectual property."

25   *See Rambus*, 522 F.3d at 466 (emphasis in original).

26           The opinions of Dr. Gregory Leonard, Defendants' expert witness, mirror the allegations

27   made in Defendants' counterclaims: "

28

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
Case No. 4:13-cv-1300-JSW

McKool Smith Hennigan P.C.
A Professional Corporation · Attorneys
Redwood Shores, CA

- REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED -

1

2

3

4 ." (Ex. B, Expert Report of Gregory K. Leonard, Ph.D

5 (Jan. 25, 2016) ("Leonard Report") at ¶ 30). Dr. Leonard also likewise failed to establish that

6 IEEE "'would not have adopted the standard in question but for the misrepresentation or

7 omission'" of ChriMar. *See Rambus*, 522 F.3d at 466 (quoting Hovenkamp). Dr. Leonard

8 indicated only that

9

10

11 . (Leonard

12 Report at ¶¶ 30–31 (citing conversation with Matthew Shoemake on Jan. 25, 2016)). *See also* Ex.

13 C, Mar. 8, 2016 Deposition of Dr. Leonard at 91:13–15 ("

14 ."; *id.* at

15 111:20–23 ("

16 Accordingly, Defendants' expert witness did

17 not foreclose the possibility that IEEE would have adopted ChriMar's technology had it known

18 of ChriMar's pending patent application.

19      At most, Defendants and its experts have argued that IEEE *could* have implemented other

20 technologies that they allege are suitable alternatives—not that IEEE *would* have. In fact, as

21 acknowledged by Mr. Robert Mills, ChriMar's expert, "neither Dr. Leonard nor Dr. Shoemake

22 provide any opinion or basis to conclude that the IEEE would have adopted one of the purported

23 alternatives for detection and classification had ChriMar disclosed the application that issued as

24 the '250 patent[.]" (Ex. D, Rebuttal Expert Report of Robert Mills (Feb. 16, 2016) ("Mills

25 Rebuttal Report")) at ¶ 19. In contrast, ChriMar analyzed those alternative technologies and

26 determined that they are inferior to ChriMar's patented technology. (*See* Ex. E, Expert Report of

27 Robert Mills (Jan. 25, 2016) ("Mills Report") at ¶ 164 ("The inventions disclosed in the Patent-

28

McKool Smith Hennigan P.C.
A Professional Corporation · Attorneys
Redwood Shores, CA

- REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED -

1   In-Suit are fundamental to PoE functionality and provide significant benefits relative to

2   alternative technologies that were available at the time that the IEEE 802.3af and 802.3at

3   standards were ratified."). *See also id.* at ¶ 165, Tables 6 and 7 (indicating that alternatives were,

4   for example, "Not commercially viable; incomplete proposal"; "Not commercially viable;

5   requires additional components; more complex; more expensive"; "Not commercially viable;

6   requires additional components; more complex; inferior"; "Not commercially viable; requires

7   extra circuitry"; "Not commercially viable; requires changes in chip design.") (summarizing Ex.

8   F, Opening Expert Report of Dr. Vijay Madisetti (Jan. 25, 2016) at ¶¶ 167–94).

9       Given "the likelihood that [IEEE] would have standardized [ChriMar's] technologies

10  *even if [ChriMar] had disclosed* its intellectual property," Defendants have "failed to

11  demonstrate that [ChriMar's] conduct was exclusionary, and thus to establish [their] claim that

12  [ChriMar] unlawfully monopolized the relevant markets." *See Rambus*, 522 F.3d at 466, 467

13  (emphasis in original).   The Court should, therefore, grant summary judgment against

14  Defendants on their IEEE-Related Counterclaims and Affirmative Defenses.

### B.   Summary Judgment Is Proper Because Defendants Cannot Establish That the IEEE Bylaws and Related Documents Imposed a Duty of Disclosure.

16  All of Defendants' IEEE-Related Counterclaims and Affirmative Defenses presuppose

17  that ChriMar had a duty to disclose certain intellectual property to the IEEE under the

18  requirements of the IEEE rules.   In fact, the record shows that the IEEE does not impose such an

19  obligation, and ChriMar never agreed to any such obligation.

### 1.   Interpretation of the IEEE Rules is a Matter of Law.

22  The existence or absence of a duty to disclose patents in a standards setting environment

23  is a question of law to be decided by the Court. *Hynix Semiconductor Inc. v. Rambus Inc.*, 441 F.

24  Supp. 2d 1066, 1073 (N.D. Cal. 2006); *Winet v. Price*, 4 Cal. App. 4th 1159, 1166 (Cal. App. 4th

25  1992) (contract interpretation a question of law in California); *see also Rambus Inc. v. Infineon

26  Techs. AG*, 318 F.3d 1081, 1087 n.3 (Fed. Cir. 2003) ("A number of states treat the existence of

27  a disclosure duty as a question of law, and the breach of that duty as a question of fact.").

28

McKool Smith Hennigan P.C.
A Professional Corporation • Attorneys
Redwood Shores, CA

- REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED -

## 2. Imposition of a Contractual Duty Requires Sufficiently Definite Terms and Requires an Agreement to Abide by Those Terms.

Formation of a contract requires contract terms "clear enough that the parties can understand what each is required to do." *Hynix*, 441 F. Supp. 2d at 1073. Furthermore, contract formation requires mutual agreement on the contract terms. *Id.* at 1074.   A lack of details regarding alleged "disclosure" policies precludes a finding of mutual agreement on terms. *Id.*

> A policy that does not define clearly what, when, how, and to whom the members must disclose does not provide a firm basis for the disclosure duty necessary for a fraud verdict. *Without a clear policy, members form vaguely defined expectations as to what they believe the policy requires -- whether the policy in fact so requires or not.*"

*Rambus Inc. v. Infineon AG*, 318 F.3d 1081, 1102 (Fed. Cir 2003) (emphasis added).

> Just as lack of compliance with a well-defined patent policy would chill participation in open standard-setting bodies, after-the-fact morphing of a vague, loosely defined policy to capture actions not within the actual scope of that policy likewise would chill participation in open standard-setting bodies.

*Rambus v. Infineon* 318 F.3d at 1102 n.10.

In the present case, Defendants cannot satisfy their burden to prove that the IEEE patent policy in 2000–05 imposed a duty of disclosure on participants or attendees at IEEE meetings. Even assuming they could make such a showing, ChriMar's statements to the IEEE establish that ChriMar clearly opposed agreeing to any such duty.

## 3. The IEEE Imposed No Duty of Disclosure on ChriMar.

Defendants allege the IEEE Standards Association Board (IEEE-SA Board) bylaws (section 6) and operations manual (sections 6.3 and 6.3.2) for years 2000, 2001, and 2005 impose a duty on all participants to disclose "the existence of patents or patent applications that may contain claims essential to practicing the standard."  (Ex. M, January 25, 2016 Expert Report of M. Shoemake ¶¶ 77, 65–67, 72 ("Shoemake Report"); *e.g.*, Cisco Answer at 7, 10; HP Answer at 6, 9.)[11]  But as Mr. Holleman explains (ChriMar's expert and former IEEE-SA Board Chairman),

---

[11]  The bylaws and operations manual can be found at Ex. G, ChriMar_ITC00124285 (2000 bylaws), Ex. H, ChriMar_ITC00124302 (2001 bylaws), Ex. I, ChriMar_ITC00124363 (2005 bylaws), Ex. J, ChriMar_ITC00124483 (2000 operations manual), Ex. K, ChriMar_ITC00124521 (Dec. 2000 operations manual), and Ex. L, THOMPSON00001444

McKool Smith Hennigan P.C.
A Professional Corporation • Attorneys
Redwood Shores, CA

1    the bylaws and operations manual describe duties of the IEEE staff, officers, and committee

2    chairs—not duties of all participants in the IEEE standards-setting process. (Ex. N, February 16,

3    2016 Rebuttal Expert Report of Dr. Richard Holleman at ¶¶ 23, 26 ("Holleman Report")).

4         The bylaws themselves describe the responsibilities of the IEEE-SA Board. (Ex. G,

5    ChriMar_ITC00124285 at 1 (2000 Bylaws) ("The details of its [(the IEEE-SA Standards

6    Board's)] responsibilities beyond that specified in the IEEE Standards Association (IEEE-SA)

7    Bylaws are stipulated by these bylaws, as supplemented by the *IEEE-SA Standards Board*

8    *Operations Manual*.")). One of those responsibilities is to "[r]eview[] all proposed IEEE

9    standards to determine whether the proposed standards conform to the requirements established

10   by the IEEE-SA Standards Board." (*Id.*). Section 6 of the bylaws explains how the IEEE-SA

11   Standards Board reviews proposed standards that may read on patents, namely, "IEEE standards

12   may include the known use of patent(s)," as long as certain conditions are met. (*Id.* at 12). One

13   of those conditions is that "the IEEE receives assurance from the patent holder," which is known

14   as a letter of assurance (LoA). (*Id.*).

15        The sentence: "[t]his assurance shall be provided without coercion and prior to approval

16   of the standard . . . . ," does not impose a duty on the patent-holder to provide such assurance

17   (*i.e.*, an LoA), but instructs the IEEE-SA Standards Board on how to review LoAs. (*Id.*). "This

18   assurance" refers to the assurance discussed in the prior sentence: "the IEEE receives assurance

19   from the patent holder." (*Id.*). It refers to an existing LoA already provided by a patent holder,

20   not a duty to provide a non-existing LoA. As such, the sentence does not require a patent holder

21   to provide an LoA, but requires (1) that the already-provided LoA not have been coerced and (2)

22   that the already-provided LoA have been received before approval of the standard, not after.

23   Defendants' proposed interpretation of placing an affirmative legal duty on ChriMar is

24   inconsistent with the language that the LoA be provided without coercion—*i.e.*, voluntarily

25

26   _____

27   (2005 operations manual). Dr. Shoemake states that ███████████████████████████████

     ████████████████████████████████████████████████████████████████████

28   (Shoemake Report ¶¶ 65 n.80, 67 n.81, 72).

McKOOL SMITH HENNIGAN P.C.
A PROFESSIONAL CORPORATION · ATTORNEYS
REDWOOD SHORES, CA

- REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED -

1    provided, not coerced by force, legal or otherwise.[12] Placing an affirmative legal duty on

2    ChriMar would be, by definition, coercion, which is explicitly against the bylaws. Instead, the

3    IEEE-SA Standards Board used a "request and encourage" process—not a mandatory disclosure

4    requirement—to obtain letters of assurance without coercion. (Holleman Report at ¶23).

5          The purpose of the IEEE-SA Standards Board Operations Manual is "to specify the

6    procedures that shall be followed in the standards-development process." (Ex. J,

7    ChriMar_ITC00124483 (2000 operations manual) at 1). It should be understood as explaining

8    how the *business* of the IEEE-SA Standards Board will be conducted, not as creating new duties

9    on participants in the standards-setting process. (Holleman Report at ¶30). In section 6.3, the

10   statement that "Patent holders shall submit letters of assurance to the IEEE Standards

11   Department . . . before the time of IEEE-SA Standards Board review for approval," does not

12   create a duty to submit an LoA. (Ex. J, ChriMar_ITC00124483 at 24). Instead, it specifies to

13   whom the LoAs should be sent, and that they should be sent before the Board reviews the

14   standard for approval. But this still does not impose a requirement that a patent holder submit an

15   LoA in the first place. Indeed, in section 6.3.2, the operations manual again states that any

16   assurance "shall be obtained *without coercion*." (*Id.* at 25).

17         Furthermore, review of the bylaws and operations manual shows they are written as

18   instructions for the IEEE-SA Standards Board and its committees, not as instructions or duties to

19   individual participants in the standards-setting process. (Ex. G, ChriMar_ITC00124285 (2000

20   Bylaws) §1 (authority for establishing Board), §2 (Board's role and purpose), §3 (Board's

21   governing documents), §4 (organization and membership of Board and committees), §5 (Board's

22   procedures and responsibilities"), §6 (patent policy), §7 (modification and interpretation bylaws);

23   ChriMar_ITC00124483 (2000 operations manual) §4 (Board meeting procedures), §5 (procedure

24   for standards development), §6 (copyright, trademark, and patent policies), §7 (IEEE

25   representation at other standards-setting organizations), §8 (publication of IEEE standards), §9

26

McKOOL SMITH HENNIGAN P.C.
A PROFESSIONAL CORPORATION • ATTORNEYS
REDWOOD SHORES, CA

27   _____
     [12] Coerce means "to restrain or constrain by force, *esp. by legal authority*." *Webster's New
     World^{TM} College Dictionary* (4th Ed. 2000) at 283 (emphasis added).

28

- REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED -

1   (updating IEEE standards), §10 (amending operations manual)). Furthermore, the task force and

2   study group meetings attended by John Austermann were not meetings under the IEEE-SA

3   Standards Board, thus the IEEE-SA Standard Board bylaws would not control. Instead, proposed

4   standards are developed by the "technical committees of the IEEE Societies," not by IEEE-SA

5   Standards Board or its committees. (Ex. G, ChriMar_ITC00124285 (2000 Bylaws) at 7).

6       Even had the IEEE rules imposed a duty of disclosure, that duty would only be incurred

7   as a result of post-PAR involvement, not pre-PAR involvement.[13]  The Ottawa and La Jolla

8   meetings attended by ChriMar in 2000 were post-PAR meetings for 802.3 af. The form LoA

9   required by the IEEE at that time, and filled out by ChriMar for its '260 patent, only requested a

10  listing of "published application[s]"—not unpublished ones. (Ex. DD, CSI1915758). But the

11  '250 and '622 patents were not published until 2004, several years after ChriMar ceased any

12  involvement with 802.3 af. ChriMar would not have had a continuing duty long after it ceased its

13  involvement. The January 2005 meeting in Vancouver was a pre-PAR meeting for 802.3at, (Ex.

14  M, Shoemake Report ¶ 123), thus attendance could not incur any alleged duty to file an LoA.

### 4.    ChriMar Did Not Agree to a Duty to Disclose.

16      To treat standards policies as contracts requires not only terms clear enough for the

17  parties to understand their obligations, but also mutual assent. *Hynix Semiconductor Inc. v.

18  Rambus Inc.*, 441 F. Supp. 2d 1066, 1073–74 (Fed. Cir. 2006). ChriMar did not agree to a duty

19  of disclosure but rejected such a duty in its correspondence with the IEEE.

20      ChriMar believed it attended its first two IEEE standards meetings as an invited guest.

21  Mr. Austermann testified he was invited to present ChriMar's product at the Ottawa meeting,

McKool Smith Hennigan P.C.
A Professional Corporation • Attorneys
Redwood Shores, CA

---

[13] In 2007, the IEEE investigated its patent policy with regards to pre-PAR meetings, such as Study Groups. (Ex. N, Holleman Report ¶ 48 (citing Ex. CC, THOMPSON00005377)). The IEEE concluded that "IEEE-SA Intellectual Property Policy does not currently address, define nor accommodate Intellectual Property Guidelines for Pre-PAR Activities." (Ex. CC, THOMPSON00005377 at 5386). Even today, the IEEE still does not issue a call for patents at pre-PAR Study Groups, though it recommends the patent policy be displayed. (http://standards.ieee.org/faqs/patents.pdf ("5. Should a Call for Patents be issued at a Study Group or other meetings that occur before approval of a Project Authorization Request (PAR)? No. However, it is recommended that the Patent Slides for pre-PAR Meetings be used in these meetings.")).

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
Case No. 4:13-cv-1300-JSW

- REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED -

1  where Mr. Steve Carlson asked Mr. Austermann to instead present at the next meeting in La

2  Jolla.  (Ex. O, May 8, 2012 Deposition of John Austermann at 199:11–200:11, 226:8–20,

3  228:11–18).[14] Prior to attending the IEEE meetings, Mr. Austermann was unaware of any IEEE

4  patent policy.  (Ex. O, May 8, 2012 Deposition of John Austermann at 189:24–191:6).  Even had

5  ChriMar known about IEEE patent policy, Mr. Austermann plainly stated at the La Jolla meeting

6  that ChriMar would not be participating in the IEEE standards-setting process for PoE.  (Ex. P,

7  THOMPSON00009978 at 9980; *see also* Ex. Q, Chrimar_ITC00056628 ("CMS has indicated

8  that they do not wish to participate . . .")).  Thus Mr. Austermann's attendance was not assent to

9  a duty of disclosure.

10         After the Ottawa and La Jolla meetings, ChriMar analyzed the IEEE rules and came to

11  understand there was no affirmative duty to disclose, only a voluntary process of disclosure.

12  ChriMar relied not only on its own reading of IEEE policies, but also sought clarification from

13  the IEEE and from other companies on how to understand the rules.    (Ex. R,

14  THOMPSON00015283 (asking IEEE representative Geoff Thompson about letters of

15  assurance); Ex. S, CHRIMAR_ITC00272761 (discussing IEEE patent policies with John Siemon

16  of Siemon); Ex. T, CHRIMAR_ITC00269404 (asking Rick Marcotte of Invensys regarding

17  IEEE bylaws and patent enforceability)).

18         Even leading up to ChriMar's attendance at the January 2005 meeting, Mr. Austermann

19  sought to clarify any obligations resulting from his attendance.  (Ex. U, THOMPSON00015297

20  at 3-4 ("CMS would like to confirm that we are not giving up any expressed or implied

21  intellectual property rights or giving any implied warrants, or is under any IEEE or industry

22  assumptions by making this payment or by registering for this meeting.")).    IEEE's

23  representative, Mr. Mike McCormack, refused to provide any clarification.    (*Id.*).

24  Contemporaneous internal discussions at ChriMar further show ChriMar understood there to be

25  no duty of disclosure.  In an e-mail, Mr. Udi Naamani asked Mr. Austermann whether or not

26

27  [14] This is further supported by e-mails after the La Jolla meeting, showing Mr. Austermann
     thought he was an invited guest—not a participant.  (Ex. P, THOMPSON00009978 at 9980).

28

- REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED -

1  ChriMar was going to provide a letter of assurance, which would not have been an issue had

2  ChriMar believed itself under a duty of disclosure.  (Ex. V, Chrimar_ITC00275216).

3      The IEEE patent policies at the time did not place a clear—or any—contractual duty of

4  disclosure on ChriMar, especially as ChriMar was very clear in its communications that ChriMar

5  did not assent to any such contractual duty.

6      **C.      Summary Judgment Is Proper Against Defendants' Patent Misuse
             Affirmative Defense.**

7

8      Defendants' patent misuse affirmative defense "'arises from the equitable doctrine of

9  unclean hands, and relates generally to the use of patent rights to obtain or to coerce an unfair

10  commercial advantage.'" *Hynix Semiconductor, Inc. v. Rambus, Inc.*, 609 F. Supp. 2d 988, 1030

11  (N.D. Cal. 2009) (quoting *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1372 (Fed. Cir.

12  1998)).  Because Defendants "base that their patent misuse defense on the same allegations as

13  their antitrust and unfair competition claims and since those claims were not proved, the defense

14  necessarily fails." *See Hynix Semiconductor*, 609 F. Supp. 2d at 1030.  As set forth above,

15  Defendants cannot prevail on their IEEE-Related Counterclaims and Affirmative Defenses,

16  including their unclean hands affirmative defense.  (*See, supra*, § III.A, III.B).  Thus, summary

17  judgment is appropriate for their patent misuse affirmative defenses as well.

18  **IV.   SUMMARY JUDGMENT SHOULD BE GRANTED AS TO CISCO'S IEEE-
         RELATED COUNTERCLAIMS AND AFFIRMATIVE DEFENSES BECAUSE
         THEY ARE TIME-BARRED.**

19

20      Cisco's IEEE-Related Counterclaims and Affirmative Defenses are also barred by the

21  statute of limitations.

22      "A statute of limitations defense may be raised by a motion to dismiss or by a motion for

23  summary judgment" *Kauffman-Stachowiak v. Omni Hotels Mgmt. Corp.*, No. 15-cv-05186-

24  WHO, 2015 U.S. Dist. LEXIS 169077, at *3 (N.D. Cal. Dec. 16, 2015) (citing *Jablon v. Dean

25  Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980)).  *See Beard v. Pennington*, No. 14-cv-03128-

26  YGR (PR), 2015 U.S. Dist. LEXIS 156810, at *30 (N.D. Cal. Nov. 19, 2015) (granting

27  defendant's motion for summary judgment and dismissing with prejudice plaintiff's claim as

28

MCKOOL SMITH HENNIGAN P.C.
A PROFESSIONAL CORPORATION • ATTORNEYS
REDWOOD SHORES, CA

- REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED -

time-barred); *Finley v. Dynamic Recovery Solutions LLC*, No. 14-cv-04028-THE, 2015 U.S. Dist. LEXIS 134305, at *20 (N.D. Cal. Sept. 30, 2015) (granting the defendant's motion for summary judgment as to the statute of limitations).

### A. Because Cisco's Breach of Contract Counterclaims Accrued in 2000 and No Later than 2005, Claims Asserted After 2009 are Time-Barred.

Cisco's breach of contract counterclaim has a four-year statute of limitations period. CAL. CODE CIV. PROC. § 337(1). "A cause of action for breach of contract accrues at the time of the breach, which starts the limitations period." *Daria v. Hurly*, No. 15-cv-00970-DMR, 2015 U.S. Dist. LEXIS 134343, at *15 (N.D. Cal. Oct. 1, 2015). *See also Greenberg v. Riversource Life Ins. Co.*, No. C 12-00552 WHA, 2012 U.S. Dist. LEXIS 111575, at *4 (N.D. Cal. Aug. 8, 2012) ("Generally, '[a] cause of action for breach of contract accrues at the time of the breach of contract, and the statute of limitations begins to run at that time regardless of whether any damage is apparent or whether the injured party is aware of his right to sue.'") (quoting *Perez-Encinas v. AmerUS Life Ins. Co.*, 468 F. Supp. 2d 1127, 1133–37 (N.D. Cal. 2006)).

Cisco alleges that ChriMar breached its contract with IEEE as early as 2000 by failing to disclose the pending '708 application, ChriMar's alleged belief of the applicability of the '708 application to the IEEE 802.3 standard, and ChriMar's alleged unwillingness to license the '250 patent on RAND terms,[15] and that ChriMar's alleged failures ended sometime before 2003.[16]

Contrary to Cisco's allegations, Cisco was an active participant in the IEEE during the relevant timeframe.[17] Also, Cisco knew of the '708 application and the fact that ChriMar did not disclose the '708 application to the IEEE in 2005.  Accordingly, Cisco knew or should have known of ChriMar's alleged breach of contract with the IEEE.  The foregoing establishes that ChriMar's alleged breach of contract accrued as early as 2000 and no later than 2005. Even assuming an accrual date of 2005, Cisco was required to assert its breach of contract claims by 2009. Cisco did not, thus its breach of contract counterclaim must be dismissed as time-barred.

---

[15] Dkt. No. 369 at ¶ 115.

[16] Ex. W, December 11, 2015 Deposition of Chad Jones at 48:21–49:11; Dkt. No. 369 at ¶ 115.

[17] Dkt. No. 209-6, ChriMar's Disclosure of Asserted Claims and Infringement Contentions at 7.

MCKOOL SMITH HENNIGAN P.C.
A PROFESSIONAL CORPORATION • ATTORNEYS
REDWOOD SHORES, CA

- REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED -

McKool Smith Hennigan P.C.
A Professional Corporation · Attorneys
Redwood Shores, CA

**B.      Cisco's Unfair Business Practices Counterclaims Accrued No Later Than 2005, and Claims Filed after 2009 Are Time-Barred.**

Cisco's counterclaims of unfair business practices under § 17200 have a four-year statute of limitations. *See* CAL. BUS. & PROF. CODE § 17208. Because those unfair business practices claims are based on a California statute, the default accrual rule is the "last element rule," pursuant to which a claim accrues "when [it] is complete with all of its elements—those elements being wrongdoing, harm, and causation." *Ryan v. Microsoft Corp.*, No. 14-CV-04634-LHK, 2015 U.S. Dist. LEXIS 158944, at *24 (N.D. Cal. Nov. 23, 2015) (citations and quotations omitted). Cisco has alleged that ChriMar's wrongdoing upon which their unfair business practices claims are based occurred in 2000, 2001, and 2005, causing harm to the IEEE, its members, and the entire industry.[18] Even giving Cisco the benefit of a 2005 accrual date is of no moment, given that Cisco would not assert its counterclaims until 2012—three years after the statute of limitations for those claims passed.

An exception to the default accrual rule for claims based on California statutes is the "discovery rule," which "postpones accrual of a claim until the plaintiff discovers, or has reason to discover, the cause of action." *Id.* at *65 (citing *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1024 (9th Cir. 2008)). Here, the discovery rule does not save Cisco's UCL claims from being time-barred, as Cisco knew or should have known of ChriMar's allegedly tortious acts at the time they occurred (in the 2000–2001 time period) and certainly by no later than 2005, at least because Cisco knew of the '708 application and that ChriMar did not disclose the '708 application to the IEEE in 2005. Cisco was part of the IEEE 802.3af working group, and the disclosures are publically available.[19]

**C.      Because Cisco's Monopolization Counterclaim Accrued in 2001, Claims After 2005 Are Time-Barred.**

The statute of limitations for Cisco's monopolization counterclaim is four years. *See* 15 U.S.C. § 15b ("Any action to enforce any cause of action under section 15, 15a, or 15c of this

---

[18] Dkt. No. 369 at ¶¶ 8, 58, 115; Ex. W, Dec. 11, 2015 Deposition of Chad Jones at 48:21–49:11; Ex. X, Dec. 18, 2015 Deposition of Dan Lang at 153:16–155:16.

[19] *See* Ex. W, Dec. 11, 2015 Deposition of Chad Jones at 40:6–22 ("███████████████████████████████████████████████████████████")).

- REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED -

McKool Smith Hennigan P.C.
A Professional Corporation • Attorneys
Redwood Shores, CA

1  title shall be forever barred unless commenced within four years after the cause of action

2  accrued."). For monopolization under Section 2 of the Sherman Act, "[g]enerally, a cause of

3  action accrues and the statute begins to run when a defendant commits an act that injures a

4  plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971).

5      According to Cisco, with the standardization of IEEE 802.3af and IEEE 802.3at and lock-

6  in with the industry incorporating the standards, ChriMar's failure to disclose the '708

7  application, disclose the patent's coverage of the IEEE standard, and disclose that ChriMar was

8  unwilling to license what would later issue as the '250 patent on RAND terms, according to

9  Cisco, injured the entire industry.[20] Moreover, as set forth above, Cisco knew or should have

10  known of ChriMar's offending acts.   Chad Jones, Cisco's 30(b)(6) witness, testified that

11  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [21] ▮▮▮▮

13  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ [22]

14      According to the allegations made by Cisco in its interrogatory responses and the

15  testimony of its witnesses, the entire industry, including Cisco, suffered an injury by ChriMar's

16  alleged nondisclosure of its patent in 2001, resulting in IEEE's standardization of IEEE 802.3

17  that allegedly reads on the '250 patent, for which the industry must obtain licenses to practice

18  and at non-RAND rates.  Thus, in 2001, ChriMar allegedly committed an act that injured Cisco's

19  business, and Cisco's monopolization counterclaim accrued in 2001.  Cisco was required to

20  assert its monopolization claim by 2005.  Because Cisco would not allege that ChriMar violated

21  Section 2 of the Sherman Act until 2012, Cisco's monopolization counterclaim against ChriMar

22  is time-barred.

23

24

25

26  ---
[20] Dkt. No. 369 at ¶¶ 11, 18, 28, 38–40.

27  [21] Ex. W, Dec. 11, 2015 Deposition of Chad Jones at 35:4–14.

28  [22] Ex. X, Dec. 18, 2015 Deposition of Dan Lang at 153:16–154:8.

- REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED -

**D.  Cisco's Fraud Counterclaim Accrued in 2000, Rendering any Claim Filed after 2003 Outside the Statute of Limitations.**

Cisco's fraud claim has a three-year statute of limitations. *See Rivera v. BAC Home Loans Servicing, L.P.*, 756 F. Supp. 2d 1193, 1200 (N.D. Cal. 2010) ("[U]nder California Code of Civil Procedure section 338(d), '[a]n action for relief on the ground of fraud or mistake' must be brought within three years after the party discovers the fraud." (quoting CAL. CIV. PROC. CODE § 338). "A fraud claim accrues when the aggrieved party discovers the facts constituting the fraud." *Daria*, 2015 U.S. Dist. LEXIS 134343, at *12. "A party alleging fraud has a duty to exercise diligence in discovering the fraud, such that the three year limitation begins to run when that party 'has the opportunity to obtain knowledge from sources open to his investigation.'" *Rivera*, 756 F. Supp. 2d at 1200 (quoting *Lee v. Escrow Consultants, Inc.*, 210 Cal.App.3d 915, 921 (1989)).

Cisco alleges that in 2000, 2001, and 2005, ChriMar had a duty, but failed to disclose the existence of the '708 application, its belief as to the patent application's applicability to the IEEE standard, and its unwillingness to license the '250 patent on RAND terms.  (Dkt. No. 369 at ¶¶ 8, 58, 115).  Cisco was aware of the '708 application in 2005[23] and was also in attendance at the IEEE meeting on January 26, 2005, as well as other meetings in the summer of 2005 where ChriMar and its '622 patent were discussed. (Dkt. No. 209-6, ChriMar's Disclosure of Asserted Claims and Infringement Contentions at 7).  Cisco thus knew or should have known of ChriMar's alleged fraud, given its knowledge of the '708 application and the fact that ChriMar did not disclose the '708 application to the IEEE in 2005.  *See Rivera v. BAC Home Loans Servicing, L.P.*, 756 F.Supp.2d 1193, 1200 (N.D. Cal. 2010) ("A party alleging fraud has a duty to exercise diligence in discovering the fraud, such that the three year limitation begins to run when that party 'has the opportunity to obtain knowledge from sources open to his investigation.'") (quoting *Lee v. Escrow Consultants, Inc.*, 210 Cal.App.3d 915, 921 (1989)).

Accordingly, there is no genuine issue of material fact as to when Defendants' counterclaims, which are grounded in ChriMar's alleged failure to disclose the '708 application

McKOOL SMITH HENNIGAN P.C.
A PROFESSIONAL CORPORATION • ATTORNEYS
REDWOOD SHORES, CA

---

[23] Ex. X, Dec. 18, 2015 Deposition of Dan Lang at 153:16–154:8.

- REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED -

to the IEEE, accrued: as early as 2000 and no later than 2005. Assuming the statute of limitations clock did not begin to run on Defendants' counterclaims until 2005, because Defendants' counterclaims were not asserted until 2012—7 years later—those counterclaims are time-barred under the three- and four-year statute of limitations that govern the breach of contract, unfair business practices, monopolization, and fraud counterclaims.

## V. SUMMARY JUDGMENT AGAINST CISCO'S MONOPOLIZATION COUNTERCLAIM IS APPROPRIATE ALSO BECAUSE CHRIMAR DOES NOT HAVE MARKET POWER.

To succeed on its monopolization counterclaim under Section 2 of the Sherman Act, Cisco must prove ChriMar's "(1) possession of monopoly power in a relevant market; (2) willful acquisition or maintenance ('use') of that power; and (3) causal antitrust injury." *Eichman v. Fotomat Corp.*, 880 F.2d 149, 163 (9th Cir. 1989) (citing *Catlin v. Washington Energy Co.*, 791 F.2d 1343 (9th Cir. 1986)). Assuming only for purposes of this motion that Cisco can establish a relevant market, summary judgment is proper because Cisco cannot establish that ChriMar has market power in a relevant market.

Monopoly claims under Section 2 of the Sherman act "require a showing of monopoly power, commonly referred to as market power." *Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (N.D. Cal. 1997). Market power may be demonstrated through either of two types of proof. One type of proof is direct evidence of the injurious exercise of market power. If the plaintiff puts forth evidence of restricted output and supracompetitive prices, that is direct proof of the injury to competition which a competitor with market power may inflict, and thus, of the actual exercise of market power. *Rebel Oil Co., Inc. v. Atlantic Richfield, Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (citing *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61, 90 L. Ed. 2d 445, 106 S. Ct. 2009 (1986)). The more common type of proof is circumstantial evidence pertaining to the structure of the market. To demonstrate market power circumstantially, a plaintiff must: (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run. *Id*.

McKool Smith Hennigan P.C.
A Professional Corporation • Attorneys
Redwood Shores, CA

1   Cisco cannot establish, and has not established, direct evidence of market power.

2   Therefore, Cisco must show, *inter alia*, that ChriMar owned a dominant share of the market. *See*

3   *Image Tech. Servs.*, 125 F.3d at 1206 (citing *Rebel Oil*, 51 F.3d at 1434). "Courts generally

4   require a 65% market share to establish a prima facie case of market power." *Id.* (citing *Am.*

5   *Tobacco Co. v. United States*, 328 U.S. 781, 797 (1946)).  Cisco's own expert, Dr. Leonard,

6   opines that ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

7   ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉.

8   (Ex. Y, Feb. 16, 2016 Rebuttal Expert Report of G. Leonard at ¶ 116).

9       To the extent that Cisco's monopolization counterclaim is predicated on alleged improper

10  acts before the IEEE,[24] its monopolization counterclaim fails as set forth above in Section III.

11  Nevertheless, even assuming that ChriMar acted improperly toward the IEEE, Cisco must still

12  demonstrate that it is a competitor of ChriMar in a relevant market.  *Portney v. CIBA Vision*

13  *Corp.*, 593 F. Supp. 2d 1120 (C.D. Cal. 2008) ("[A]n allegation of control over prices does not

14  establish monopoly power unless the actor controlling prices is also a competitor in the relevant

15  market.").  Cisco has provided no such evidence that ChriMar is a competitor of Cisco in any

16  market, which is terminal to Cisco's claim.  *Transphase Sys. v. Southern Cal. Edison Co.*, 839 F.

17  Supp. 711, 717 (C.D. Cal. 1993) ("It is axiomatic in antitrust law that a defendant may not be

18  found liable for monopolizing or attempting or conspiring to monopolize a market unless that

19  defendant is a competitor in the relevant market and his conduct creates a dangerous probability

20  that he will gain a dominant share of the market."); *Mercy-Peninsula Ambulance, Inc. v. County*

21  *of San Mateo*, 791 F.2d 755, 759 (9th Cir. 1986) ("[t]he county perform[ed] no health care

22

23  ───────────────
[24] Cisco's pleading also discusses the fact that ChriMar has engaged in litigation to protect its
24  patent rights (Dkt. No. 369 at ¶¶ 82, 87), which cannot form the basis of a Sherman Act claim
    under the *Noerr-Pennington* doctrine.  *See Apple, Inc. v. Motorola Mobility, Inc.*, 886 F. Supp.
25  2d 1061, 1075-1077 (W.D. Wis. 2012) ("Apple's antitrust claim is premised on Motorola's
    attempt to enforce its patents. Because Motorola's enforcement of its patents is privileged
26  conduct protected by the First Amendment, the *Noerr-Pennington* doctrine applies.") (citing
    *Columbia Pictures Industries, Inc. v. Professional Real Estate Investors, Inc.*, 944 F.2d 1525,
27  1529 (9th Cir. 1991) (holding that defendant was immune from antitrust liability under Noerr-
    Pennington because all of plaintiff's claimed antitrust injuries were caused by defendant's
28  enforcement of copyrights, not by defendant's refusal to license its copyrighted work)).

McKool Smith Hennigan P.C.
A Professional Corporation • Attorneys
Redwood Shores, CA

services" and was "not a competitor in the healthcare provision market and [could not] be charged with having used market position to exclude competition."). Moreover, Cisco cannot satisfy this requirement by merely arguing that ChriMar somehow influences the Power over Ethernet market. *See name.space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1131 (9th Cir. 2015) ("name.space argues that ICANN should be considered a participant in the three markets because ICANN has ultimate control over TLDs, which are the essential aspect of each of the relevant markets. But this does not mean that ICANN competes in the markets."); *Olde Monmouth Stock Transfer Co. v. Depository Trust & Clearing Corp.*, 485 F. Supp. 2d 387, 392-93 (S.D.N.Y. 2007) (rejecting the argument that "market power under Section 2 of the Sherman Act encompasses 'influence' by a non-competitor over the relevant market").

Because ChriMar does not hold market power, Cisco's Sherman Act claim must fail.

## VI. SUMMARY JUDGMENT ON CISCO'S "LICENSE / RELEASE" DEFENSE IS APPROPRIATE.

Cisco predicates its seventh affirmative defense of "license/release" and eighth affirmative defense of "lack of subject matter jurisdiction" on: (i) ChriMar's alleged acts and omissions before the IEEE; and (ii) the August 19, 2005, Cisco/ChriMar License Agreement. (Dkt. No. 369 at ¶¶ 25-27). Summary judgment as to (i) is appropriate for all the reasons discussed herein with respect to the IEEE-Related Counterclaims and Affirmative Defenses. Summary judgment as to (ii) is appropriate for the following reasons.

[25] As discussed below in Section VII, that Agreement also granted Cisco

---

[25] The '260 patent is unrelated to the '250 patent-in-suit.

McKool Smith Hennigan P.C.
A Professional Corporation · Attorneys
Redwood Shores, CA

[REDACTED]

[REDACTED] nant. [26]

"'In patent law, an implied license merely signifies a patentee's waiver of the statutory right to exclude others from making, using, or selling the patented invention.'" *Hynix Semiconductor, Inc. v. Rambus, Inc.*, 609 F. Supp. 2d 988, 1030 (N.D. Cal. 2009) (quoting *Wang Labs., Inc. v. Mitsubishi Elecs. Am. Inc.*, 103 F.3d 1571, 1580 (Fed. Cir. 1997)).

Here, there was undoubtedly no waiver of the statutory right to exclude. Accordingly, summary judgment on basis (ii) of Cisco's "License/Release" and "Lack of Subject Matter Jurisdiction" defenses is appropriate.

## VII. BECAUSE CISCO SATISFIES THE KNOWLEDGE AND INTENT REQUIREMENTS OF INDIRECT INFRINGEMENT, SUMMARY JUDGMENT IS WARRANTED.

This Court should also enter judgment that Cisco knew of the '250 patent before this suit was filed and that any infringement was intentional or willfully blind. Cisco had knowledge of ChriMar's asserted '250 patent before suit was filed on October 31, 2011. [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]. Thus, there can be no genuine dispute that Cisco possessed knowledge of the '250 patent.

Evidence of Cisco's pre-suit knowledge of the asserted patent— [REDACTED]

[REDACTED] — proves that Cisco knowingly infringed, *Commil USA, LLC v. Cisco Systems*, 575 U.S. __, 135 S. Ct. 1920 (2015), or at a minimum that Cisco was willfully blind that it infringed under *Global-Tech Appliances, Inc. v. SEB S.A*, 563 U.S. 754 (2011). Additional evidence supports this view.

<u>First</u>, the covenant not to sue Cisco was [REDACTED]

[REDACTED]

---

[26] Ex. Z, August 19, 2005, License Agreement, § 2.12.

McKool Smith Hennigan P.C.
A Professional Corporation · Attorneys
Redwood Shores, CA

McKool Smith Hennigan P.C.
A Professional Corporation · Attorneys
Redwood Shores, CA

1
2      " (Ex. Z, August 19, 2005, License Agreement, § 2.12).

3     Second, in this present litigation, Cisco waived reliance on an opinion of counsel.

4     Third, Cisco's 30(b)(6) witness testified that,

5

6     . According to Cisco, there were two reasons for that:

7

8

9

10

11     . Neither of these rationales withstand scrutiny.

12     As to the alleged statement made to Mr. Cooper,[27] at the time of the 2005 settlement, the

13 '250 patent did not exist, as it was still the pending '708 application.  Nor were the claims of

14 what became the '250 patent in existence in 2005 because the pending claims of the '708

15 application underwent a series of amendments, for example on February 5, 2008 and August 1,

16 2008, after the 2005 negotiations and before the PTO issued it on November 25, 2008, as the

17 '250 patent. (Ex. BB, Excerpts from file history of '250 patent).  Thus, even assuming

18

19     , that would not have relieved Cisco of its

20 obligation to assess any future risks it was subject to with respect to ChriMar and the '708

21 application by, for example, ensuring it would not infringe the patent that issued some three

22 years later by monitoring the '708 application as it worked its way through the PTO.

23     Moreover, Cisco at no time sought to reduce the alleged oral statement to writing, either

24 in the 2005 license agreement or in any other document. To the contrary,

25

26
---

27 [27] ChriMar's outside counsel, Glenn Forbis testified that he would be "surprise[d] . . . that those statements would have been made by me." Ex. AA, May 8, 2012 Deposition of Glenn Forbis at 25:6–26:8.

28

1    ██████████████████████████████,[28] rendering its professed reliance on ChriMar's

2    alleged oral representation highly suspect. Also, had ChriMar actually made this oral statement,

3    ChriMar would not have had any legitimate basis to insist that ████████████

4    ██████████████████████████████████████████████████████

5    ████████

6         Similarly, Cisco's decision not to monitor the claims of the '708 application through

7    issuance based on its reading of the specification conflicts with its desire to obtain a full license

8    to the '708 application and its eventual acquiescence ████████████████████.

9    Cisco's decision not to monitor the claims of the '708 application undoubtedly constitutes

10   "willful blindness" in view of its agreement that ChriMar does not waive damages that may

11   accrue, and further in view of the claims that actually issued and our infringement read based on

12   those claims. *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (U.S. 2011)

13   ("[D]efendants cannot escape the reach of these statutes by deliberately shielding themselves

14   from clear evidence of critical facts that are strongly suggested by the circumstances").

15   **VIII.  SUMMARY   JUDGMENT   OF   NO   INEQUITABLE   CONDUCT   IS**
16   **APPROPRIATE.**

17        Assuming, *arguendo*, that Mr. Boenke is an unnamed co-inventor of the '250 patent,

18   Cisco and HP's Fourteenth Affirmative Defense of Inequitable Conduct and Count VII for

19   Unenforceability due to Inequitable Conduct cannot survive summary judgment (Dkt. No. 369,

20   Dkt. No. 373).

21        "To prevail on the defense of inequitable conduct, the accused infringer must prove that

22   the applicant misrepresented or omitted material information with the specific intent to deceive

23   the PTO." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011).

24   ────────────────

25   [28] Ex. Z, August 19, 2005, License Agreement, Section 7.14 states ████████

26   █████████████████████████████████████████████████

27   █████████████████████████████████████████████████

28   ███████████████████████████████████

McKool Smith Hennigan P.C.
A Professional Corporation · Attorneys
Redwood Shores, CA

- REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED -

"[T]o meet the clear and convincing evidence standard, the specific intent to deceive must be the single most reasonable inference able to be drawn from the evidence. Indeed, the evidence must be sufficient to *require* a finding of deceitful intent in the light of all the circumstances.  Hence, when there are multiple reasonable inferences that may be drawn, intent to deceive *cannot* be found."  *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290-1291 (Fed. Cir. 2011) (emphasis added, citations and quotations omitted). Defendants cannot prove (1) that Mr. Boenke's inventorship is "material" under *Therasense*, or (2) that an intent to deceive the patent office is the single most reasonable inference to be drawn from the evidence.

Defendants' inequitable conduct allegations are predicated on the notion that ChriMar intended to hide Mr. Boenke as an alleged co-inventor from the patent office. However, ChriMar indisputably had a written agreement dated February 1998 with American Broadband, signed by Clyde Boenke himself, assigning to ChriMar any and all intellectual property rights that may result from that engagement—and Mr. Boenke agrees that ChriMar is the proper owner of the '250 patent.[29] (Dkt. No. 347-1, Mar. 28, 2015 Declaration of B. Jordan at Ex. A at ¶ 3). Because ChriMar owns all rights to the '250 patent, whether or not Mr. Boenke was a named co-inventor of the '250 patent, Defendants' theory that ChriMar acted to cover-up an inventorship controversy is nonsensical. Defendants' theory is a non-starter in view of the well-established law providing that "[i]ncorrect inventorship is a technical defect in a patent that may be easily curable." *Winbound Elecs. Corp. v. Int'l Trade Comm'n*, 262 F.3d 1363, 1371 (Fed. Cir. 2001).

### A.    Mr. Boenke's Alleged Co-Inventorship Is Not Material to Patentability.

As an initial matter, Defendants cannot prove that failure to disclose Mr. Boenke as a co-inventor could be "material" under the Federal Circuit's *Therasense* standard.  Failure to join a co-inventor is not fatal to obtaining a patent because inventorship in such circumstances can be easily corrected.  *Id.*  Because correction of inventorship is procedurally available even at the patent office, courts have held that failure to join a co-inventor does not satisfy the "materiality"

---

[29] At his earliest deposition Mr. Boenke testified that ChriMar "owned all patent rights" to the work Mr. Boenke did for ChriMar.  Dkt. No. 347-3, Jan. 29, 2015 C. Boenke Tr. at 165:19 in *ChriMar et al. v. Alcatel-Lucent et al.*, 613-cv-880 (E.D. Tex.)).

McKool Smith Hennigan P.C.
A Professional Corporation • Attorneys
Redwood Shores, CA

prong of *Therasense*. *See Auxilium Pharms., Inc. v. Watson Labs., Inc.*, No. 12-3084 (JLL), 2014 U.S. Dist. LEXIS 184032, at *101 (D.N.J. Dec. 16, 2014); *Ind. Forge, LLC v. Miller Veneers, Inc.*, 736 F. Supp. 2d 1201, 1208 (S.D. Ind. 2010). Under the facts of this case, had Mr. Boenke been identified at the outset as a co-inventor, he would have merely been added to the patent based on his contractual obligation to assign his rights to ChriMar—even if Mr. Boenke refused to join in the application. *See* 35 U.S.C. § 116(b). Therefore, the issue of Mr. Boenke's inventorship is not material information that could support a finding of inequitable conduct.

### B.   The Evidence in This Case Does Not "Require a Finding of Deceitful Intent."

Defendants would have the fact finder in this case believe that ChriMar tried to keep an inventor off a patent, whose intellectual property rights ChriMar already owned by written assignment, with the only possible outcome being to put the validity of the patent in jeopardy. Nothing could be further from the truth, and even when asked directly whether he was intentionally omitted from the patents at issue, Mr. Boenke could not say that he was. (Dkt. No. 338-5, DeVries Decl. at Ex. 2, Dec. 18, 2015 Boenke Tr. at 190:14-24).

In fact, Mr. Boenke is simply not a co-inventor of the '250 patent and Mr. Boenke and his son[30] received consideration to execute a *nunc pro tunc* agreement because ChriMar did not have a copy of the original written assignment agreement. When a defendant in another case put inventorship at issue, ChriMar sought a *nunc pro tunc* agreement to reduce future litigation costs. (Dkt. No. 338-5, DeVries Decl. at Ex. 4, Jan. 14, 2016 J. Beebe Tr. at 39:2-12 ("[T]he sort of calculus at the time was . . . that we could eliminate future litigation costs by going ahead and getting that assignment.")). It was not until Cisco subpoenaed Mr. Boenke for documents in this case that the original written assignment agreement from 1998 was located.

---

[30] Mr. Boenke's son was also involved in the consulting work that American Broadband did for ChriMar and assigned all intellectual property resulting therefrom to ChriMar. (Dkt. No. 338-5, DeVries Decl. at Ex. 2, Dec. 18, 2015 Boenke Tr. 212:1-15 ("Q. And American Broadband had an obligation to surrender any intellectual property resulting from their agreement -- from their relationship with ChriMar; right? A. We were to transfer to them anything that we came up with, yes. Q. And so would Doug [Boenke] have been a part of that agreement? 15 A. Yes.") (objections omitted)

McKool Smith Hennigan P.C.
A Professional Corporation - Attorneys
Redwood Shores, CA

- REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED -

1  Despite the above reasonable explanation, Defendants still contend that ChriMar acted to

2  deceive the patent office, predicated—not on evidence—but on the misunderstandings and

3  exaggerated speculations of Mr. Boenke.  For example, Mr. Boenke described the payment in

4  consideration for the *nunc pro tunc* agreement as "hush money" in a letter to Cisco counsel, even

5  though Mr. Boenke admitted that no one ever told or suggested to him that he not testify and that

6  he has since been disabused of that notion.  (Dkt. No. 338-5, DeVries Decl. at Ex. 2, Dec. 18,

7  2015 C. Boenke Tr. at 224:17-227:4; 210:3-9).   Defendants counsel also capitalizes on Mr.

8  Boenke's errant and temporary belief that his testimony was limited by a standard "no challenge"

9  clause in the *nunc pro tunc* agreement,[31] yet ChriMar has done absolutely nothing to preclude his

10 testimony and Mr. Boenke testified freely both before and after the agreement. (Dkt. No. 338-5,

11 DeVries Decl. at Ex. 2, Dec. 18, 2015 Boenke Tr. at 210:3-9 ("Q. Do you think that ChriMar has

12 any problem with your testifying here today?  A. As -- as I understand it now, no."); Dkt. No.

13 338-5, DeVries Decl. at Ex. 2, Dec. 18, 2015 Boenke Tr. at 210:3-9; 224:17-227:4).   Mr.

14 Boenke's misunderstandings are not evidence that ChriMar intended to deceive the patent office.

15 Defendants also allege that Messrs. Austermann and Cummings falsely passed Mr.

16 Boenke's work as their own by stating in the sworn affidavit that "[w]e designed circuitry that

17 was utilized in conjunction with a system and method for performing the claimed subject matter

18 prior to the critical date." (Dkt. 369 at ¶56; Dkt. 373 at ¶56).  Defendants omit from their

19 pleading that that the very next sentence attaches and refers to copies of the circuit diagrams

20 themselves showing plainly to the Patent Office that the schematics were generated by American

21 Broadband and Clyde Boenke.  (Dkt. No. 338-5, DeVries Decl. at Ex. 10 at  3, Exhibits B1-B17;

22

23 [31] The Federal Circuit has estopped assignors of patents from raising invalidity claims against the
    assignee. *Diamond Scientific Co. v. Ambico, Inc.*, 848 F.2d 1220, 1224 (Fed. Cir. 1988).

24 Assignor estoppel is based on the equitable conclusion that an "assignor should not be permitted
    to sell something and later to assert that what was sold is worthless, all to the detriment of the

25 assignee" who already compensated the assignor fully. *Id.*  Such "no challenge" provisions are
    common in assignment and license agreements, and have gained in popularity following the U.S.

26 Supreme Court's decision in *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 135 (2007)
    wherein the absence of a no-challenge clause in the parties' license agreement was a basis for

27 upholding the licensee's right to challenge the licensor's patent – "it is not clear where the
    prohibition against challenging the validity of the patents is to be found [and this] can hardly be

28 implied . . . ."

McKool Smith Hennigan P.C.
A Professional Corporation • Attorneys
Redwood Shores, CA

- REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED -

Dkt. 369 at ¶56; Dkt. 373 at ¶56).  In fact, Mr. Boenke testified that Messrs. Austermann and Cummings did *in fact* "design[] circuitry that was utilized in conjunction with a system and method for performing the claimed subject matter" just as their declaration states:

> Q. Let's turn now to Exhibit 10, and I'll direct your attention back to Page 3 of this document. There was a paragraph there talking about circuitry design. Do you see that in Paragraph 6?
> A. Okay.
> **Q. Is it your testimony that John and Marshall had no involvement in designing circuitry relating to the '622 patent?[32]**
> **A. No. That would be inaccurate because they did have input into some of the circuitry that was designed.**
> Q. So they did circuitry design work?
> A. No. They had input into the circuitry design.
> Q. When I said circuitry design work, what did you take me to mean?
> A. What pieces do you use, what resistors do you use, what currents do you flow, how fast does it run.
> **Q. And so what input did they have into the circuit design?**
> **A. One of the things that Marshall inputted as we designed the -- all these pictures back here I think are the -- the protection module so-called, which is the hub. He wanted to go from inductors to put the current onto the system to resistors, partly for cost and partly because I said that was a safer thing to do for the Ethernet environment. So it was things like that.**
> **Q. So there was collaboration involved?**
> **A. Yes.**
> Q. . . . As part of your contract work for ChriMar, you were hired to finalize schematics as seen in Exhibit B1 through B17 of this document; correct?
> A. You'll have to say what finalize is because those originated with us.
> Q. They hired you to create these schematics; correct?
> A. It was part of our job to create the schematics.
> Q. And your name is on the schematics; right?
> A. It is.
> Q. And the name of your company is on these schematics; right?
> A. That's correct.

(Dkt. No. 338-5, DeVries Decl. at Ex. 2, Dec. 18, 2015 Boenke Tr. at 206:15-208:17 (objections omitted)).  Defendants cannot seriously argue that Mr. Austermann and Mr. Cummings were lying to the patent office, much less that their declaration was *unmistakably false[33]* by stating that

---

[32] The '250 patent claims priority to the '622 patent.

[33] "[A]ffirmative acts of egregious misconduct, such as the filing of an unmistakably false affidavit" can constitute inequitable conduct.  *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1292 (Fed. Cir. 2011).

McKool Smith Hennigan P.C.
A Professional Corporation • Attorneys
Redwood Shores, CA

- REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED -

they "designed circuitry" in view of the above facts.  ChriMar did not even attempt to hide from the patent office that American Broadband and Clyde Boenke generated the circuit schematics given that American Broadband's and Clyde Boenke's names appear plainly in the exhibits submitted as attachments to that declaration.  (Dkt. No. 338-5, DeVries Decl. at Ex. 10).

In sum, Defendants' proposed claims of inequitable conduct are based on what Defendants know are simply misunderstandings by Mr. Boenke.  Defendants' would attempt to prove that ChriMar is embroiled in an unnecessary scandal because, even if Mr. Boenke were a co-inventor on the '250 patent, all of Mr. Boenke's rights were assigned to ChriMar in 1998 anyway.  The reality is much simpler as set forth above, and Defendants' misguided theory is further proof that "the inequitable conduct doctrine has plagued not only the courts but also the entire patent system" and that defendants in patent cases are quick to resort to "the specter of inequitable conduct charges" on "the slenderest of grounds."  *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1289 (Fed. Cir. 2011).

## IX.    CONCLUSION

ChriMar requests that the instant motion be granted and Defendants' counterclaims of breach of contract and unfair business practices, declaratory judgment action for a declaration of patent unenforceability due to patent misuse, Cisco's additional counterclaims of monopolizations and fraud, and Defendants' affirmative defenses of equitable estoppel, unclean hands, waiver, license, and patent misuse, be dismissed. ChriMar also requests summary judgment that Cisco satisfies the knowledge and intent requirements of indirect infringement.

- REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED -

1

Dated: April 29, 2016                    Respectfully submitted,

2

                                         McKool Smith P.C.

3

                                         /s/ Brandon Jordan
4                                        Brandon Jordan

5                                        Courtland L. Reichman
6                                        McKool Smith Hennigan P.C.
                                         255 Shoreline Drive, Suite 510
7                                        Redwood Shores, CA 94065
                                         Telephone: (650)-394-1401
8                                        Facsimile: (650)-394-1422

9
                                         Robert Auchter (PRO HAC VICE)
10                                       Benjamin Levi (PRO HAC VICE)
                                         Dirk D. Thomas (PRO HAC VICE)
11                                       Brandon M. Jordan (PRO HAC VICE)
                                         Christopher J. Mierzejewski (PRO HAC VICE)
12                                       McKool Smith P.C.
13                                       1999 K Street NW, Suite 600
                                         Washington, DC 20006
14                                       Telephone: (202) 370-8300
                                         Fax: (202) 370-8344
15                                       rauchter@mckoolsmith.com
                                         blevi@mckoolsmith.com
16                                       dthomas@mckoolsmith.com
                                         bjordan@mckoolsmith.com
17                                       cmierzejewski@mckoolsmith.com

18
                                         Attorneys for Plaintiffs ChriMar Systems Inc. d/b/a
19                                       CMS Technologies and ChriMar
                                         Holding Company, LLC
20

21

22

23

24

25

26

27

28

McKool Smith Hennigan P.C.
A Professional Corporation · Attorneys
Redwood Shores, CA