**NOT FOR CITATION**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRIMAR SYSTEMS INC, *et al.*, | Case No.  13-cv-01300-JSW |
| Plaintiffs, | |
| v. | **ORDER GRANTING, IN PART, AND DENYING, IN PART, MOTION FOR SUMMARY JUDGMENT** |
| CISCO SYSTEMS, INC, *et al.*, | Re: Dkt. Nos. 379, 380-4 |
| Defendants. | |

Now before the Court for consideration is the motion for summary judgment filed by ChriMar Systems, Inc. d/b/a CMS Technologies and ChriMar Holding Company LLC (collectively "ChriMar").  The Court has considered the parties' papers, relevant legal authority, and the record in this case, and it HEREBY GRANTS, IN PART, AND DENIES, IN PART, ChirMar's motion.[1]

**BACKGROUND**

In this patent dispute, ChriMar accused Cisco Systems, Inc. and Lynksys, LLC f/k/a Cisco Consumer Products LLC (collectively "Cisco"), and Hewlett Packard Co. ("HP") of infringing United States Patent No. 747,250, entitled "System for Communicating with Electronic Equipment" (the "'250 Patent").  John F. Austermann III ("Mr. Austermann") and Marshall B. Cummings ("Mr. Cummings") are the listed inventors on the '250 Patent.

---

[1]     The unredacted version of ChriMar's motion is located at docket no. 380-4, and the final redacted version is located at docket no. 433-1.  Defendants' unredacted cross-motion and opposition is located at docket no. 393-6, and the final redacted version is located at docket no. 434-1.  ChriMar's unredacted opposition and reply is located at docket no. 398-4, and the final redacted version is located at docket no. 434-1.  Defendants' unredacted reply is located at docket no. 403-5, and the final redacted version of the reply is located at docket no. 424.

United States District Court
Northern District of California

On September 27, 2019, the Court granted, in part, and denied, in part, Defendants' motion for summary judgment of non-infringement ("9/27/19 Order").  (Dkt. No. 462.)  On November 12, 2019, the Court denied ChriMar's motion for leave to file a motion for reconsideration of that ruling.  (Dkt. No. 469.)

Defendants filed counterclaims against ChriMar and raised affirmative defenses to ChriMar's claims for infringement.  In light of the Court's ruling on Defendants' motion for summary judgment of non-infringement, the Court DENIES, AS MOOT, ChriMar's motion for summary judgment on Defendants' affirmative defenses.[2]

This Order addresses ChriMar's motion for summary judgment on the counterclaims for: (1) patent unenforceability due to unclean hands; (2) breach of contract; and (3) inequitable conduct, which are asserted by both Cisco and HP.  The Order also addresses ChriMar's motion for summary judgment on Cisco's counterclaims for: (1) monopolization in violation of Section 2 of the Sherman Act (the "Sherman Act claim"); (2) violations of California's unfair competition law, Business and Professions Code sections 17200, *et seq.* (the "UCL claim"); and (3) fraud.  In large part, these counterclaims arise out of ChriMar's alleged acts and omissions before the Institute for Electrical and Electronics Engineers ("IEEE"), although Defendants also assert ChriMar engaged in inequitable conduct before the United States Patent and Trademark Office ("USPTO").

**A.      IEEE Standards Regarding Power over Ethernet.**

The IEEE includes a Standards Association ("IEEE-SA").  The IEEE SA's Standards Board "is responsible on an Institute-wide basis for a) [e]ncouraging and coordinating the development of IEEE standards [and] b) [r]eviewing all proposed IEEE standards to determine whether the proposed standards conform to the requirements established by the IEEE-SA Standards Board and whether consensus has been achieved for approval of the proposed

_____

[2]      Cisco raised affirmative defenses of: (1) estoppel; (2) unclean hands; (3) waiver; (4) patent misuse; (5) license/release; (6) lack of subject matter jurisdiction; and (7) inequitable conduct.  HP raised affirmative defenses of: (1) estoppel; (2) unclean hands; (3) waiver; (4) implied license; (5) lack of subject matter jurisdiction; (6) patent misuse; and (7) inequitable conduct.

1   standards."  (Dkt. No. 379-1, April 29, 2016 Declaration of Brandon M. Jordan ("4/29/16 Jordan

2   Decl."), ¶ 9; Dkt. No. 379-9, 4/29/16 Jordan Decl., Ex. G (Excerpts of 2000 IEEE-SA Standards

3   Board Bylaws, § 1).)

4            ChriMar alleged that Defendants infringed the asserted claims of the '250 Patent through

5   products that comply with two IEEE standards: (1) 802.3af (2003) (Standard 802.3af"); and (2)

6   802.3at (2009) ("Standard 802.3at").  Those standards relate to "Power over Ethernet" ("PoE"), in

7   which a remote device is powered using the same Ethernet cabling used to transmit data, so that it

8   can operate without a local power source.  (Dkt. No. 392-2, May 13, 2016 Declaration of Michael

9   W. DeVries ("5/13/16 DeVries Decl.") ¶ 6; Dkt. 393-8, 5/13/16 DeVries Decl., Ex. 5 (Excerpts of

10   Opening Report of Dr. Vijay Madisetti ("Madisetti Report") ¶ 66); 5/13/16 DeVries Decl., ¶ 3;

11   Dkt. No. 392-4, 5/13/16 DeVries Decl., Ex. 2 (May 13, 2016 Declaration of Dr. George

12   Zimmerman ("5/13/16 Zimmerman Decl.") ¶ 16).)  In particular, ChriMar focused on the initial

13   "detection" and "classification" steps described in the IEEE standards.  (*See* 9/27/19 Order at 6:1-

14   7:16.)

15   **B.      The IEEE's Patent Disclosure Policy and ChriMar's Alleged Conduct Before the**
         **IEEE.**
16

17            Defendants contend the IEEE has a patent policy by which members and participants in the

18   standard setting process are required to disclose any patents and/or patent applications that may

19   read on a proposed standard.  According to Defendants, ChriMar had a duty to disclose to the

20   IEEE the '250 Patent, or its applications, and had a duty to advise the IEEE whether or not

21   ChriMar would be willing to issue licenses on reasonable and nondiscriminatory ("RAND") terms.

22   (*See, e.g.,* Dkt. No. 368-4, Unredacted Version of Cisco Amended Answer, Affirmative Defenses

23   and Third Amended Counterclaims, Counterclaim ¶ 28; Dkt. No. 372-4, Unredacted Version of

24   HP Amended Answer, Affirmative Defenses, and Second Amended Counterclaims, Counterclaim

25   ¶ 27.)[3]  Defendants contend ChriMar knowingly and intentionally failed to disclose either the '250

26

27   _____
     [3]        Defendants did not use continuous paragraph numbers in their Amended Answers,
28   Affirmative Defenses, and Counterclaims.  To make clear which sections are at issue, the Court
     will cite to these sections as "Answer ¶ [x]", "Aff. Def. ¶ [x]", or "Counterclaim ¶ [x]."

United States District Court
Northern District of California

Patent or its application, Application No. 10/668,708 ("'708 Application") to the IEEE.

In 2000 and 2001, the IEEE-SA Standards Board Operations Manual provided, in part, as follows:

> 6.3 Patents.
>
> **The patent policy is set forth in clause 6 of the *IEEE-SA Standards Board Bylaws.***
>
> Patent Holders shall submit letters of assurance to the IEEE Standards Department … before the time of IEEE-SA Standards Board review for approval.
>
> In the event that a patent may apply to a standard and a letter of assurance cannot be obtained, the working group shall refer this matter to the Patents Administrator in the IEEE Standards Department.
>
> Unless the letter of assurance is received from an individual within the issuing organization who has clear authority for intellectual property and/or legal matters, the IEEE Standards Department (Administrator, Intellectual Property) shall send a certified letter, return receipt requested, to the General Counsel of the issuing organization to confirm receipt of the letter of assurance and to ensure that the letter of assurance is factually correct and was submitted by an appropriate individual within the issuing organization.  No response to this letter, other than the return receipt, is required.
>
> The IEEE will provide contact information about the patent holder upon request.
>
> …
>
> 6.3.2. Submittal.
>
> Through the working group, the Sponsor chair shall request that known patent holders submit a statement either that the patent does not apply to the standard or that licenses will be made available without compensation or under reasonable rates, terms, and conditions.  This assurance shall be obtained without coercion and submitted to the IEEE at the earliest practical time prior to the approval of an IEEE standard.  The IEEE encourages early disclosure to the working group of patent information that might be relevant to the standard.
>
> While standards may include the known use of patents if there is technical justification, the working group should not attempt to determine whether or not a patent applies.  The working group shall accept the view of the patent holder.

(4/29/16 Jordan Decl., ¶¶ 11-12; Dkt. No. 379-12, 4/29/16 Jordan Decl., Ex. J (2000 IEEE-SA

Standards Board Operations Manual, §§ 6, 6.3.2 (emphasis added)); Dkt. No. 379-13, 4/29/16

Jordan Decl., Ex. K (2001 IEEE-SA Standards Board Operations Manual, §§ 6, 6.3.2) (emphasis

added).)

In 2000 and 2001, Section 6 of the IEEE-SA Standards Bylaws provided:

> IEEE standards may include the known use of patent(s), including patent applications, if there is technical justification in the opinion of the standards-developing committee and provided the IEEE receives assurance from the patent holder that it will license applicants under reasonable terms and conditions for the purpose of implementing the standard.  This assurance shall be provided without coercion and prior to approval of the standard (or reaffirmation when a patent becomes known after initial approval of the standard).  This assurance shall be a letter that is in the form of either

> a) A general disclaimer to the effect that the patentee will not enforce any of its present or future patent(s) whose use would be required to implement the proposed IEEE standard against any person or entity using the patent(s) to comply with the standard or

> b) A statement that a license will be made available to all applicants without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination.

(2000 IEEE-SA Standards Bylaws, § 6; *see also* 4/29/16 Jordan Decl., ¶ 9; Dkt. No. 379-10,

4/29/16 Jordan Decl., Ex. H (2001 IEEE-SA Standards Bylaws, § 6).)

In 2005, Section 6 of the IEEE-SA Standards Board bylaws was modified to provide:

> IEEE standards may include the known use of essential patents and patent applications provided the IEEE receives assurance from the patent holder or applicant with respect to patents whose infringement is, or in the case of patent applications, potential future infringement of the applicant asserts will be, unavoidable in a compliant implementation of either mandatory or optional portions of the standard (essential patents).  This assurance shall be provided without coercion and prior to approval of the standard (or reaffirmation when a patent or patent application becomes known after initial approval of the standard).  This assurance shall be a letter that is in the form of either

> a) A general disclaimer to the effect that the patentee will not enforce any of its present or future patent(s) whose use would be required to implement either mandatory or optional portions of the proposed IEEE standard against any person or entity using the patent(s) to comply with the standard or

> b) A statement that a license for such implementation will be made available to all applicants without compensation, or under

> reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination.
>
> This assurance shall apply, at a minimum, from the date of the standard's approval to the date of the standard's withdrawal and is irrevocable during that period.

(4/29/16 Jordan Decl., ¶ 10; Dkt. No. 379-11, 4/29/16 Jordan Decl., Ex. I (IEEE-SA Standards Board Bylaws 2005, § 6).)

In 2005, Section 6 of the IEEE-SA Standards Board Operations manual was modified as well. Section 6 on Patents was modified slightly to provide: (1) the PatCom Administrator would receive referrals if letters of assurance could not be obtained; and (2) the PatCom Administrator would follow up if a letter of assurance was not received from an individual who had clear authority for intellectual property and legal matters. The last clause also was modified to provide that "[t]he IEEE will make public the contact information about the patent holder or patent applicant that is provided in the letter of assurance." (4/29/16 Jordan Decl., ¶ 13; Dkt. No. 379-14, Ex. L (2005 IEEE-SA Standards Board Operations Manual, § 6).)

Section 6.3.2 of the IEEE-SA Standards Board Operations Manual was modified as well and the title was changed to "Call for patents." That section was modified to provide:

> The chair of an IEEE standards-developing working group or the chair of an IEEE standards sponsor shall be responsible for informing the members of the working group that if any individual believes that a patent or patent application might be essential to the implementation of the standards, that fact should be made known to the entire working group. This request shall occur at every standards-developing meeting
>
> The chair or the chair's delegate shall request that each potential essential patent holder submit either a patent letter of assurance (in accordance with Clause 6 of the *IEEE-SA Standards Board Bylaws*) or a statement that the potential essential patent holder is not aware of any patents or patent applications that it owns that would be infringed by a compliant implementation of the standards.
>
> Patent letter of assurance or nonawareness statements from potential essential patent holders shall be submitted to the PatCom Administrator.

(2005 IEEE-SA Standards Board Operating Manual, § 6.3.2.)

It is undisputed that representatives of ChriMar, including Mr. Austermann, attended IEEE meetings.  Those meetings include a May 2000 meeting in Ottawa, a July 2000 meeting in La Jolla, California, a December 2000 meeting in New York, and a January 2005 meeting in Vancouver, British Columbia.  (5/13/16 DeVries Decl., ¶ 27; Dkt. No. 393-26, 5/13/16 DeVries Decl., Ex. 26 (Confidential Declaration of John F. Austermann, III ("Austermann Decl."), ¶¶ 8-11).)

The minutes of the December 2000 meeting, which was a meeting of the IEEE Standards Association Patent Committee, show that Mr. Austermann raised the "issue that if the P802.3af product became adopted as an IEEE Standard, it is his view that this would have a devastating financial impact on his company, and that his company may hold *one or more patents* covering technology in the P802.3af project."  (5/13/16 DeVries Decl., ¶ 29; Dkt. No. 392-30, 5/13/16 DeVries Decl., Ex. 28 (Minutes at 3 (emphasis added).)  According to the minutes, the committee provided Mr. Austermann with advice on how he could present to the "IEEE-SA patent claims his company believes to be relevant to the subject 802 project."  (*Id.*)

In October 2001, ChriMar sent a letter to the IEEE-SA Standards Board Patent Committee, in which it advised the committee that it believed that products manufactured in compliance with Standard 802.3af would infringe U.S. Patent No. 5,406,260 (the "'260 Patent").  ChriMar stated it would agree to license the '260 Patent on RAND terms.  (5/13/16 DeVries Decl., ¶ 24; Dkt. No. 392-25, 5/13/16 De Vries Decl., Ex. 23 (Letter at ECF p.2).)  In December 2001, ChriMar supplemented the October letter with the IEEE's "Letter of Assurance for Essential Patents" ("IEEE Form Letter of Assurance")  (*Id.*, at ECF p. 4.)  The IEEE Form Letter of Assurance contains a section which states "[i]f the Patent Holder owns or controls granted patents(s) and/or *pending applications* that it believes may be infringed by compliance with the Proposed IEEE Standard, please specify the patent number, *published application*, and/or relevant claims."  (*Id.* (emphasis added).)  ChriMar only listed the '260 Patent.  It is undisputed that ChriMar never submitted a letter of assurance to the IEEE for the '708 Application or for the '250 Patent.

In 2011, Mr. Austermann attested that, at the May meeting in Ottawa, he demonstrated ChriMar's Ether-Lock II product "for the purpose of fostering propagation or use of what was to

become the '250 patent and to facilitate or hasten the practical application of the invention by bringing it to market."  (Austermann Decl., ¶ 8.)  Mr. Austermann attested that he attended the July 2000, December 2000, and January 2005 meetings to present and discuss ChriMar's "patented and patent pending technology for the purpose of fostering propagation or use of what was to become the '250 Patent and to facilitate or hasten the practicable application of the invention by bringing it to market."  (*Id.*, ¶¶ 9-11.)

**C.    Inventorship and Inequitable Conduct.**

Defendants allege that when Mr. Austermann and Mr. Cummings prosecuted the '250 Patent, they intentionally did not name Clyde Boenke as an inventor.  (*See, e.g.,* HP Counterclaims ¶¶ 149-155; Cisco Counterclaims ¶¶ 120-126.)  It is undisputed that ChriMar hired Mr. Boenke's company, American Broadband, Inc., in connection with the development of ChirMar's "EtherLock" products.

On February 3, 1998, Mr. Boenke, on American Broadband's behalf, signed a "Confidential Information and Inventors Agreement" ("Inventors Agreement"), which provides that he agreed to "perform or propose[d] to perform services as an independent contractor for" ChirMar.  (Dkt. No. 347-1, Declaration of Brandon Jordan dated March 28, 2016 ("3/28/16 Jordan Decl."), ¶ 2; Dkt. No. 347-2, 3/28/16 Jordan Decl., Ex. A (Inventors Agreement, Preamble).)[4]  Mr. Boenke agreed, *inter alia* that:

> [a]ny inventions, proprietary information, or discoveries, whether or not patentable or copyrightable resulting from any work I do as an independent contractor (alone or with others) of [ChirMar] shall be promptly disclosed to [ChriMar] and shall be its exclusive property. I hereby assign to [ChriMar] any rights I have or may acquire in such property and agree to sign and deliver at any time any instruments confirming the exclusive ownership by [ChriMar].

(Inventors Agreement, ¶ 3.)[5]

---

[4]    Many of the documents on which the parties rely to address the facts on these counterclaims were filed in connection with Defendants' motion for leave to file amended answers and counterclaims.

[5]    This agreement was memorialized in writing.  In 2015, Mr. Boenke testified in litigation that ChriMar filed against Alcatel-Lucent, among others (the "*Alcatel* litigation") that he and Mr. Cummings had a verbal "understanding" that "any consulting that we did for [ChriMar], they

United States District Court
Northern District of California

In September 1999, Mr. Austermann and Mr. Cummings submitted a declaration to the USPTO in connection with U.S. Patent Application No. 09/370,430, a parent application to the '708 Application, which issued as the '250 Patent. (5/13/16 DeVries Decl., ¶ 73; Dkt. No. 392-74, 5/13/16 DeVries Decl., Ex. 72 (Declaration and Power of Attorney).) In that declaration, Mr. Austermann and Mr. Cummings attested they believed they were "the original, first and sole inventor (if only one name is listed below) or an original, first and joint inventor (if plural names are listed below) of the subject matter which is claimed and for which a patent is sought on the invention entitled SYSTEM FOR COMMUNICATING WITH ELECTRONIC EQUIPMENT." Mr. Boenke is not listed as an inventor in that declaration. (*Id.*)

On June 14, 2010, Mr. Austermann and Mr. Cummings signed a declaration that was submitted to the USPTO in connection with a re-examination proceeding regarding claims 43, 79 and 115 of the '250 Patent, in light of U.S. Patent No. 6,473,608 (the "'608 Lehr Patent"). (Dkt. No. 338-5, March 14, 2016 Declaration of Michael DeVries ("3/14/16 DeVries Decl."), ¶ 12; Dkt. No. 338-15, 3/14/16 DeVries Decl., Ex. 10 (Declaration of Austermann/Cummings Under 37 C.F.R. § 1.131 ("Austermann/Cummings Decl."), ¶ 6).) Mr. Austermann and Mr. Cummings attested they were "co-inventors of the" '250 Patent and attested they "conceived and constructively reduced to practice at least the claimed subject matter prior to January 12, 1999, the critical date of the '608 Lehr Patent." (*Id.* ¶¶ 1, 4.) They also attested "[w]e designed circuitry that was utilized in conjunction with a system and method for performing the claimed subject matter prior to the critical date. Evidence of our circuit design is attached as Exhibits B1-B17. … The circuit boards were ordered from a company called American Broadband, Inc." (*Id.*, ¶ 6.)

On January 29, 2015, Mr. Boenke was deposed in the *Alcatel* litigation. Jim Alford attended that deposition on ChriMar's behalf. After the deposition, Mr. Alford approached Mr. Boenke and presented him with a check for $25,000 and a proposed assignment that would assign

owned the patent rights. (*See* 3/28/16 Jordan Decl., ¶ 3; Dkt. No. 347-3, 3/28/16 Jordan Decl., Ex. B (Jan. 29, 2015 Deposition of Clyde Boenke, *ChriMar et al. v. Alcatel-Lucent, et al.,* No. 613-cv-880 (E.D. Tex.) ("Boenke *Alcatel* Depo.") at 165:16-166:5).)

1    rights in the '250 Patent to ChriMar *nunc pro tunc*.  Mr. Boenke accepted the check, signed the

2    agreement, but he never cashed the check.  (*See, e.g.,* 5/13/16 DeVries Decl. ¶ 39; Dkt. No. 393-

3    38, 5/13/16 DeVries Decl., Ex. 38 (12/18/15 Boenke Depo. at 117:15-119:11, 124:18-23); 3/14/16

4    DeVries Decl., ¶ 4; Dkt. No. 339-14, 3/14/16 DeVries Decl., Ex. 2, (12/18/15 Boenke Depo. at

5    92:9-23, 97:2-98:7).)

6         On January 30, 2015, Mr. Boenke sent an email to Mr. Austermann.  Mr. Boenke stated his

7    testimony in the *Alcatel* litigation was "very kind to ChriMar" but warned that he would "not be so

8    in any future contact with lawyers for your targets."  (3/14/16 DeVries Decl., ¶ 3; Dkt. No. 339-

9    13, 3/14/16 DeVries Decl., Ex. 1.)  Mr. Austermann and Mr. Boenke met on February 3, 2015, at

10   which time Mr. Boenke signed a new *nunc pro tunc* assignment and received two checks for

11   $25,000; one check was made out to him and one check was made out to his son, Douglas Boenke.

12   (3/14/16 DeVries Decl., ¶ 13; Dkt. No. 339-22, 3/14/16 DeVries Decl., Ex. 11 (2/3/15

13   Assignment); 5/13/16 DeVries Decl. Ex. 38 (12/18/15 Boenke Depo. at 120:3-121:21, 123:6-16,

14   125:9-13).)  According to Mr. Boenke, no one explained the purpose of the *nunc pro tunc*

15   assignment or explained why ChriMar provided him and his son with $50,000.  (5/13/16 DeVries

16   Decl., Ex. 38 (12/18/15 Boenke Depo. at 126:3-25).)

17        The Court will address additional facts as necessary in the remainder of this Order.

18   **A.    Legal Standards Applicable to Motions for Summary Judgment.**

19        "A party may move for summary judgment, identifying each claim or defense … on which

20   summary judgment is sought."  Fed. R. Civ. P. 56(a).  A principal purpose of the summary

21   judgment procedure is to identify and dispose of factually unsupported claims.  *Celotex Corp. v.*

22   *Catrett*, 477 U.S. 317, 323-24 (1986).  Summary judgment, or partial summary judgment, is

23   proper "if the movant shows that there is no genuine dispute as to any material fact and the movant

24   is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

25        The Court may not weigh evidence or make determinations of credibility.  Rather, "[t]he

26   evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his

27   favor."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).  The party moving for summary

28   judgment bears the initial burden of identifying those portions of the pleadings, discovery, and

United States District Court
Northern District of California

10

affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323; *see also* Fed. R. Civ. P. 56(c). It is not the Court's task to scour the record in search of a disputed issue of fact. *See Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)); *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

An issue of fact is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *Anderson*, 477 U.S. at 248-49. A fact is "material" if it may affect the outcome of the case. *Id.* at 248. If the party moving for summary judgment does not have the ultimate burden of persuasion at trial, that party must produce evidence which either negates an essential element of the non-moving party's claims or show that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

Once the moving party meets its initial burden, the non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan*, 91 F.3d at 1279 (9th Cir. 1996). "A mere scintilla of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some significant probative evidence tending to support the complaint." *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997) (citation and internal quotation marks omitted). If the non-moving party fails to point to evidence precluding summary judgment, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

## A.   Defendants' Counterclaims of Unclean Hands and Inequitable Conduct.

Defendants each assert a counterclaim seeking a declaration that the '250 Patent is unenforceable because of ChriMar's unclean hands and because of its inequitable conduct. (HP Answer ¶¶ 16-19, 42-70; HP Counterclaim Count II, ¶¶ 52-56, 149-155; Cisco Answer ¶¶ 16-19, 42-70; Cisco Counterclaim Count III, ¶¶ 56-60, 120-126.)

### 1.   Unclean Hands Versus Inequitable Conduct.

The United States Supreme Court has applied the doctrine of unclean hands as a basis to dismiss patent cases in a "trio" of cases. *See Therasense, Inc. v. Becton, Dickinson and Co.*, 649

United States District Court
Northern District of California

1   F.3d 1276, 1285 (Fed. Cir. 2011) (citing *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S.

2   240 (1933), *Hazel-Atlas Glass Co. v. Hartford-Empire, Co.*, 322 U.S. 238 (1944), *overruled on*

3   *other grounds by Standard Oil Co. v. United States*, 429 U.S. 17 (1976), and *Precision Instrument*

4   *Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806 (1945)).  Based on that trio of

5   cases,

> a determination of unclean hands may be reached when misconduct
> of a party seeking relief has immediate and necessary relation to the
> equity that he seeks in respect of the matter in litigation, *i.e.*, for
> such violations of conscience as in some measure affect the
> equitable relations between the parties in respect of something
> brought before the court.  [The Supreme Court also] stated that the
> doctrine closes the doors of a court of equity to one tainted with
> inequitableness or bad faith relative to the matter in which he seeks
> relief, however improper may have been the behavior of the
> defendant, and requires that claimants have acted fairly and without
> fraud or deceit as to the controversy in issue.  The Court added that
> the doctrine necessarily gives wide range to the equity court's use of
> discretion in refusing to aid the unclean litigant.

13  *Gilead Scis., Inc. v. Merck & Co., Inc.*, 888 F.3d 1231, 1239 (Fed. Cir. 2018) ("*Gilead II*")

14  (internal quotations and citations to *Keystone Driller* and *Precision Instrument* omitted).

15          The doctrine of inequitable conduct "evolved" from this trio of unclean hands cases, but it

16  "came to embrace a broader scope of misconduct, including not only egregious affirmative acts of

17  misconduct intended to deceive both the PTO and the courts but also the mere nondisclosure of

18  information to the PTO."  *Therasense*, 649 F.3d at 1287.  The doctrine of unclean hands and

19  inequitable conduct can differ in terms of available remedies.  For example, the Federal Circuit

20  has determined that when litigation misconduct is at issue, *i.e.* misconduct that "does not infect, or

21  even affect, the original grant of the property right[,] [t]he doctrine of unclean hands does not

22  reach out to extinguish a patent right[.]"  *Aptix Corp. v. Quickturn Design Sys., Inc.*, 269 F.3d

23  1369, 1375 (Fed. Cir. 2001); *cf. Regeneron Pharm., Inc. v. Merus N.V.*, 864 F.3d 1343, 1364 (Fed.

24  Cir. 2017) (stating *Aptix* "held that courts may not punish a party's post-prosecution misconduct

25  by declaring the patent unenforceable").[6]  In contrast, inequitable conduct before the PTO, which

26  _____

27  [6]       At least one court has held that "*Aptix* forecloses a *claim* for unenforceability of a patent
    based on a theory of unclean hands," and limited the plaintiff's reliance on the theory as an

28  affirmative defense.  *Apple Inc v. Wi-Lan, Inc.*, No. 14-cv-2235 DMS (BLM), 2014 WL
    12489937, at *3 (S.D. Cal. Dec. 12, 2014) (emphasis added).

*can* infect that grant of the patent property right, may result in a finding that an entire patent is unenforceable. *Therasense*, 649 F.3d at 1287-88. Furthermore, "the taint of a finding of inequitable conduct can spread from a single patent to render unenforceable other related patents and applications in the same technology family." *Id.* at 1288.

The Court applies a clear and convincing evidence standard to determine whether Defendants would be entitled to relief based on the allegations of unclean hands or of inequitable conduct. *Id.* at 1287 (citing *Star Sci. Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1365 (Fed. Cir. 2008)); *Aptix*, 269 F.3d at 1374.

### 2. The Inequitable Conduct Counterclaims.

Defendants argue the '250 Patent is unenforceable because ChriMar committed inequitable conduct before the USPTO. To prevail on their claims of inequitable conduct, Defendants must establish by clear and convincing evidence that ChriMar "misrepresented or omitted material information with the specific intent to deceive the PTO." *Therasense*, 649 F.3d at 1287. If Defendants meet their burden, the Court must "weigh the equities to determine whether" ChriMar's conduct "warrants rendering the entire patent unenforceable." *Id.*

It is undisputed that Mr. Boenke is not – and never has been – listed as an inventor on the '250 Patent. (*See, e.g*, Declaration and Power of Attorney.) According to Defendants, ChriMar (1) intentionally omitted Mr. Boenke as an inventor of the '250 Patent; and (2) submitted unmistakably false affidavits to the USPTO, in which they either stated they were the sole inventors of the '250 Patent or claimed Mr. Boenke's work as their own.[7] Each argument depends, in part, on the assumption that Mr. Boenke is an inventor of subject matter claimed in the '250 Patent. ChriMar asserts that Mr. Boenke was not a co-inventor of the '250 Patent. ChriMar also argues that, even if Mr. Boenke was a co-inventor, Defendants' theory of a cover-up of that

---

[7]     Defendants assert "[t]he allegations included in Defendants' pleadings," specifically paragraphs 42-70 of their respective affirmative defenses, "are supported by substantial evidence." (Defs. Opp. Br. at 41:4-5.) They then provide the Court with the following string cites: "Exs. 38, 72; Dkt. Nos. 338-15, 380-19, 386-6, 386-13, 386-14, 386-18." (*Id.* at 41:5-6.) The string cite does not include all of the documents that were referenced in Defendants' allegations of inequitable conduct. It is not this Court's task to scour the record in search of genuine disputes of material fact. *See Keenan*, 91 F.3d at 1279.

United States District Court
Northern District of California

1   fact is far-fetched because Mr. Boenke assigned any rights he had to ChirMar.[8]

2          In order to be considered a "co-inventor," a person "must generally contribute to the

3   conception of the invention." *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir.

4   1998). Pursuant to *Ethicon*, a court must determine if a person contributed to the conception of

5   the invention, what the contribution was, and whether that contribution's role appears in at least

6   one claim of the claimed invention. *Id.* at 1460-61. "[T]he critical question for joint conception is

7   who conceived, as that term is used in the patent law, the subject matter of the claims at issue." *Id.*

8   at 1460. Conception, in turn, "is the 'formation in the mind of the inventor, of a definite and

9   permanent idea of the complete and operative invention, as it is hereafter to be applied in

10  practice.'" *Id.* (quoting *Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1376 (Fed.

11  Cir. 1986)). An individual "does not qualify as a joint inventor by merely assisting the actual

12  inventor after conception of the claimed invention." *Id.*

13         To satisfy its initial burden as the moving party, ChriMar must: (1) produce evidence

14  which either negates the elements of intent or materiality, or both; or (2) show Defendants do not

15  have enough evidence of one of those elements to carry their ultimate burden of persuasion at trial.

16  *Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1102. Neither ChriMar nor the Defendants have

17  presented an argument as to why Mr. Boenke should or should not be considered a co-inventor

18  under the standards set forth in *Ethicon*. The Court will address the impact of that failure in its

19  analysis of each element.

20              a.      **Materiality.**

21         In *Therasense,* the Federal Circuit "tightened" the standards for materiality in claims for

22  inequitable conduct and held "as a general matter, the materiality required to establish inequitable

23  conduct is but-for materiality." *Therasense,* 649 F.3d at 1290, 1291. That is, "an allegation of

24  inequitable conduct before the PTO requires proof that the patentee withheld or misrepresented

25

26  _____

    [8]      To the extent ChriMar disputes the issue of inventorship on the basis that Mr. Boenke
27  assigned ownership rights in his work to ChriMar, the Court does not find that argument
    persuasive. "Ownership and inventorship are distinct concepts." *Beriont v. GTE Labs., Inc.*, 535
28  Fed. Appx. 919, 926 (Fed. Cir. 2013).

1    information that, in the absence of the withholding or misrepresentation, would have prevented a

2    patent claim from issuing."  *Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333, 1345

3    (Fed. Cir. 2013).  A party also may satisfy the materiality element with clear and convincing

4    evidence that a patentee "engaged in affirmative acts of egregious misconduct, such as the filing of

5    an unmistakably false affidavit," which the Federal Circuit deems material *per se*.  *Therasense*,

6    649 F.3d at 1292 (emphasis added); *see also Outside the Box Innovations, LLC v. Travel Caddy,*

7    *Inc.*, 695 F.3d 1285, 1294 (Fed. Cir. 2012) ("[A] false affidavit or declaration is per se material.")

8         Defendants argue that ChriMar submitted two unmistakably false affidavits to the USPTO

9    and, therefore, its conduct is *per se* material.  Defendants also argue that when ChriMar applied

10   for the '250 Patent, it failed to disclose Mr. Boenke as an inventor and the omission satisfies

11   *Therasense's* "but for" standard of materiality.

12        There are two declarations at issue in this case.  The first is the declaration that Mr.

13   Austermann and Mr. Cummings submitted to the USPTO during reexamination of the '250 Patent.

14   The second is the declaration submitted when ChriMar applied for the '250 Patent.

15                    **i.    DeVries Decl., Ex. 10 - Austermann/Cummings Declaration.**

16        In the declaration submitted during re-examination, Mr. Austermann and Mr. Cummings

17   attested "*[w]e* designed circuitry that was utilized in conjunction with a system and method for

18   performing the claimed subject matter prior to the critical date.  Evidence of *our* circuit design is

19   attached as Exhibits B1-B17."  (Austermann/Cummings Decl., ¶ 6 (emphasis added).)  Mr.

20   Austermann and Mr. Cummings also attested "*[w]e* assembled the circuit boards into a system that

21   embodied the claimed subject matter prior to the critical date" and attested "[t]he circuit boards

22   were ordered from a company called American Broadband."  (*Id.*, ¶¶ 6, 8 (emphasis added).)

23   Defendants argue those statements were false because ChirMar did not merely order circuit boards

24   from American Broadband.  Instead, Defendants argue the evidence shows Mr. Boenke designed

25   the circuitry at issue.

26        It is undisputed that Mr. Boenke entered a contract with ChriMar at the time it was

27   developing the invention claimed by the '250 Patent.  (Inventors Agreement.)  Mr. Boenke also

28   was questioned about the Austermann/Cummings declaration at his deposition.  He testified that

United States District Court
Northern District of California

1    Mr. Austermann and Mr. Cummings did not design the circuitry in those exhibits.  According to

2    Mr. Boenke, "[t]hat all came from American Broadband."  (5/16/16 DeVries Decl., Ex. 38

3    (12/18/15 Boenke Depo. at 89:11-91:9).)  However, he also stated that "[t]hey had input into the

4    circuitry design" and he, Mr. Austermann, and Mr. Cummings collaborated on that.  (*Id.* at

5    206:24-207:21.)

6         Taking the facts in the light most favorable to the Defendants, the Court concludes there

7    are genuine issues of fact in dispute as to whether ChriMar presented an unmistakably false

8    affidavit to the USPTO when ChriMar filed the Austermann/Cummings Declaration.  However,

9    for reasons set forth below, the Court concludes Defendants have failed to show ChriMar acted

10   with the specific intent to deceive the USPTO when it submitted the Austermann/Cummings

11   Declaration.

12              **ii.      DeVries Decl., Ex. 72 – Declaration and Power of Attorney.**

13        Defendants also premise their claim of inequitable conduct on the theory that Mr.

14   Austermann and Mr. Cummings failed to disclose Mr. Boenke as an inventor when ChriMar

15   applied for the '250 Patent.  Mr. Boenke testified in deposition that he believed he made some

16   contributions to the invention claimed ChriMar's '622 Patent.  Mr. Boenke also testified that, to

17   the extent the '250 Patent was derivative of the '622 Patent, he could be considered an inventor of

18   the invention claimed in the '250 Patent.  Mr. Boenke testified that he "contribute[d], either jointly

19   or alone, to coming up with the idea" in Claim 1 of the '250 Patent of "the altered current flow

20   communicating information about the second piece of equipment to the central module while the

21   second piece of equipment is physically connected to the network."  (3/14/16 DeVries Decl., Ex. 2

22   (12/18/15 Boenke Depo. at 71:10-72:3, 195:5-196:9); *see also* 3/28/16 Jordan Decl., ¶ 4; Dkt. No.

23   347-4, 3/28/16 Jordan Decl., Ex. C (12/18/15 Boenke Depo. at 54:13-55:22).)  Mr. Boenke also

24   testified that he did not tell Mr. Austermann he believed he was an inventor of the invention

25   claimed in the '622 Patent.  (3/14/16 DeVries Decl., Ex. 2 (12/18/15 Boenke Depo. at 206:8-14).)

26        During his deposition, Mr. Boenke also was questioned about certain aspects of Claims 1

27   and 53 of the '250 Patent and suggested that he believed he provided contributions to the ideas set

28   forth in those claims.  (3/14/16 DeVries Decl., Ex. 2 (12/18/15 Boenke Depo. at 69:21-73:15).)

United States District Court
Northern District of California

16

1    Yet, at one point, Mr. Boenke also testified that he had "nothing to do with the '250 Patent" and

2    had "no clue" whether he should be named as an inventor on that patent.  (*Id.* at 192:16-194:4.)

3         ChriMar argues that the failure to include a co-inventor is not material.  The Court is not

4    persuaded.  "As a critical requirement for obtaining a patent, inventorship is material."  *Advanced*

5    *Magnetic Closures, Inc. v. Rome Fastener Corp.*, 607 F.3d 817, 830 (Fed. Cir. 2010) (quoting

6    *PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d 1315, 1321 (Fed. Cir. 2000));

7    *see also* 35 U.S.C. § 101; *BLM Prods. Ltd. v. Covves, LLC,* No. 17-cv-06224-RGK-PLA, 2017

8    WL 8811269, at *4 (C.D. Cal. Oct. 26, 2017) (quoting *PerSeptive,* 225 F. 3d at 1321); *Brixham*

9    *Solutions Ltd. v. Juniper Networks, Inc.*, No. 13-CV-00616-JCS, 2014 WL 250204, at *6 (N.D.

10   Cal. Jan. 22, 2014) (quoting *PerSeptive*, 225 F.3d at 1321).  Some "courts have held false

11   statements about inventorship are material without applying the but-for test of materiality."

12   *Brixham,* 2014 WL 250204, at *6 (citing *Gen-Probe Inc. v. Becton, Dickinson and Co.*, No. 09-

13   CV-2319 BEN (NLS), 2012 WL 5379062, at *2 (S.D. Cal. Oct. 30, 2012)).

14        To support its argument, ChriMar relies on *Auxilium Pharmaceuticals, Inc. v. Watson*

15   *Laboratories, Inc.*, No. 12-CV-03084 (JLL), 2014 WL 9859224, at *35. (D.N.J. Dec. 16, 2014).

16   In that case, the court held "incorrect inventorship evidence is not but-for material under

17   *Therasense*[.]"  *Id.*  However, the court qualified that statement by noting inventorship can be

18   corrected as long as there was no deceptive intent on the part of the unnamed inventor[.]"  *Id.*

19        ChriMar also relies on *Indiana Forge, LLC v. Miller Veneers, Inc.*, 736 F. Supp. 2d 1201

20   (S.D. Ind. 2001).  In that case, the court did not determine as a matter of law that the issue of

21   inventorship is not material.  Rather, the court concluded the defendants failed to show materiality

22   because they "did not indicate any reason why the patents might not have issued had the patent

23   applications identified" the co-inventor.  The court also noted that Section 256 permitted

24   correction if such "error arose without any deceptive intent."  736 F. Supp. 2d at 1208-09; *cf. Stark*

25   *v. Advanced Magnetics, Inc.*, 119 F.3d 1551, 1556 (Fed. Cir. 1997) (noting that USPTO rule for

26   correcting inventorship "considers the deceptive intent of all actual inventors").

27        The *Stark* and *PerSeptive* cases were decided prior to *Therasense* and did not apply

28   *Therasense's* but for standard of materiality.  However, ChirMar fails to point the Court to any

United States District Court
Northern District of California

17

1    authority that undermines those cases conclusions that inventorship is an issue that could lead to

2    rejection of a patent.  Defendants also posit that the omission of Mr. Boenke from the '250 Patent

3    was not innocent.  For the reasons set forth in the next section, the Court concludes that even if

4    Defendants presented sufficient evidence to satisfy the element of materiality with respect to

5    omission of Mr. Boenke from the Declaration and Power of Attorney, or that there are genuine

6    issues of fact in dispute on that element, Defendants have not demonstrated ChriMar acted with

7    the specific intent to deceive the USPTO.

8                    **b.       Intent.**

9            In order to satisfy the intent element, Defendants must show ChriMar acted with the

10   specific intent to deceive the USPTO.  *Therasense*, 649 F.3d at 1290.  The Court "may not infer

11   intent solely from materiality," and findings of gross negligence or negligence will not satisfy the

12   standard.  *Id.*  Because this case includes allegations of nondisclosure, Defendants must show

13   ChriMar "*made a deliberate decision* to withhold" information it knew was material to

14   patentability.  *Id.* (internal quotations and citations omitted, emphasis in *Therasense*).  Defendants

15   may prove their case by indirect or circumstantial evidence.  In order to "meet the clear and

16   convincing standard, the specific intent to deceive must be 'the single most reasonable inference

17   able to be drawn from the evidence.'"  *Therasense*, 649 F.3d at 1290 (quoting *Star Sci. Inc.*, 537

18   F.3d at 1366); *see also Takeda Pharm. Co. v. TWI Pharms., Inc.*, 87 F. Supp. 3d 1263, 1284 (N.D.

19   Cal. 2015) (applying "single most reasonable inference" standard at summary judgment phase of

20   proceedings).

21           Defendants do not rely on direct evidence of intent.  Instead, they argue a fact finder could

22   infer the requisite intent based on the fact that ChriMar submitted two unmistakably false

23   declarations to the USPTO and later attempted to cover up Mr. Boenke's role in the development

24   of the '250 Patent.  The Court may consider whether ChriMar repeatedly submitted false affidavits

25   to the USPTO in this analysis.  *See Intellect Wireless, Inc. v. HTC Corp.*, 732 F.3d 1339, 1345

26   (Fed. Cir. 2013); *Takeda Pharm. Co., Ltd.*, 87 F. Supp. 3d at 1286.  In *Intellect Wireless*, the

27   district court found the inventor attested he actually reduced the claimed invention to practice and

28   developed a prototype as of a specific date, when he had not done either of those things.  The

United States District Court
Northern District of California

18

1    inventor also did not clearly correct his misrepresentations.  *Id.* at 1342-43.  The district court

2    concluded the named inventor engaged in a "pattern" of making "false and misleading statements

3    during prosecution of related patents," including filing false affidavits, and concluded the "single

4    most reasonable inference" to be drawn from those representations was the intent to deceive.  *Id.*

5        The Federal Circuit affirmed.  It reasoned, in part, that "[s]ubmission of an affidavit

6    containing fabricated examples of actual reduction to practice in order to overcome a prior art

7    references raises a strong inference of an intent to deceive."  *Id.* at 1345.  That inference, coupled

8    with the pattern of submitting false affidavits and the district court's rejection of the inventor's

9    explanations for his conduct, demonstrated the district court did not "clearly err in concluding that

10   specific intent to deceive the PTO was the most reasonable inference from" the inventor's

11   conduct.  *Id.* at 1346.

12       If the Court assumes *arguendo* that Mr. Boenke was a co-inventor of subject matter

13   claimed in the '250 Patent, ChriMar's Declaration and Power of Attorney was false because it did

14   not list him as a co-inventor.  For the reasons set forth above, the Court concludes there are

15   disputed issues of fact about whether the statement in the Austermann/Cummings Declaration that

16   Mr. Austermann and Mr. Cummings "designed the circuitry" was "unmistakably false."

17   However, the drawings that were submitted as Exhibits to the Austermann/Cummings Declaration

18   clearly state they were drawn by "C. Boenke" and refer on their face to American Broadband.

19   Thus, those facts were not hidden from the examiner.  *Cf. Takeda*, 87 F. Supp. 3d at 1286 (finding

20   that defendants failed to establish materiality where they disclosed a prior art reference to the

21   USPTO, reasoning "an applicant cannot be guilty of inequitable conduct if the reference was cited

22   to the examiner, whether or not it was a ground of rejection") (quoting *Fiskars, Inc. v. Hunt Mfg.*

23   *Co.*, 221 F.3d 1318, 1327 (Fed. Cir. 2000)).

24       The record also shows that Mr. Boenke was aware that ChriMar was applying for patents

25   at the time he was working with ChriMar.  (Boenke *Alcatel* Depo. at 164:1-7.)  The evidence also

26   shows that Mr. Boenke provided ChriMar with language that was eventually incorporated into the

27   '250 Patent.  (*Compare* 3/14/16 DeVries Decl., ¶ 10; Dkt. No. 339-20, 3/14/16 De Vries Decl., Ex.

28   8 (Letter from Clyde Boenke) *with* '250 Patent at 11:65-67, 12:1-33.)

United States District Court
Northern District of California

1   In *Mformation Technologies, Inc. v. Research in Motion Ltd.*, as here, the defendants

2 argued the plaintiff engaged in inequitable conduct by failing to identify an individual (Johar) as

3 an inventor.  830 F. Supp. 2d 815, 829-30 (N.D. Cal. 2011).  The defendants contended that "the

4 named inventors of the [patent] provided a copy of the draft application for the Patent to Johar,

5 asking him to review it and inviting him to 'add more stuff' to it before it was sent to the PTO."

6 *Id.* at 829-30.  In evaluating intent, the court found it significant that the allegedly omitted inventor

7 "did not indicate to the named inventors that he too should have been named as an inventor."  *Id.*

8 at 830.  From those facts, the court determined the plaintiff provided "evidence which permits the

9 reasonable inference that the plaintiff did not believe that Johar should be regarded as an inventor

10 of the '917 Patent.  Accordingly, the evidence is insufficient to require a finding of deceitful intent

11 on the part of Plaintiff as to its failure to identify Johar as a named inventor, which means that

12 intent to deceive cannot be found."  *Id.*

13   In this case, there is no evidence that, during the course of his work for ChriMar, Mr.

14 Boenke suggested to anyone at ChriMar that he believed he should be listed as an inventor on

15 either the '622 Patent or on the '250 Patent.  Subsequently, in January 2015, Mr. Boenke sent an

16 email to one of ChriMar's lawyers stating that Mr. Austermann had refused to put Mr. Boenke's

17 name "on any patent, depriving me of credit for some very good work I did for him[.]"  (3/14/16

18 DeVries Decl., ¶ 11; Dkt. No. 339-21, 3/14/16 DeVries Decl., Ex. 9 (Email exchange).)  During

19 his deposition in this case, when asked if he thought ChriMar intentionally omitted him from the

20 '250 Patent, Mr. Boenke stated he did not know.  (3/14/16 DeVries Decl., Ex. 2 (12/18/15 Boenke

21 Depo. at 190:20-24).)  There also is evidence in the record that ChriMar did not view Mr. Boenke

22 as a co-inventor.  (3/14/16 DeVries Decl., ¶ 6; Dkt. No. 339-16, 3/14/16 DeVries Ex. 4

23 (Deposition of Joshua Beebe ("Beebe Deposition) at 39:7-12 (discussing obtaining assignment of

24 rights from Boenke and testifying that "there was lots of debate … there was actually a perspective

25 at the time he wasn't [an inventor] internally, but to the extent anyone would deem he was, that we

26 would eliminate future litigation costs by going ahead and getting that assignment").)

27   Defendants also argue that after Mr. Boenke was deposed in the *Alcatel* litigation,

28 ChriMar engaged in an effort to cover up the alleged failure to disclose him as an inventor.

1   Defendants rely on Mr. Boenke's email, in which he stated that he "was very kind to ChriMar in

2   my testimony.  Understand that I will not be so in any future contact with lawyers for your targets.

3   Trivializing my son's part in the ELID development is unforgivable."  (3/14/16 DeVries Decl., Ex.

4   1.)  In his January 2015 email, Mr. Boenke stated that he felt no compunction to help protect

5   patents not acknowledged to be his work but also suggested the *nunc pro tunc* assignment

6   included patents in which he "had no part[.]"  (3/14/16 DeVries Decl., Ex. 9.)

7        It is undisputed that Mr. Boenke did execute a *nunc pro tunc* inventorship agreement and

8   ChriMar paid him and his son $50,000.  (2/3/15 Assignment.)  At one point, Mr. Boenke

9   characterized these payments as "hush money[.]"  Yet, he also suggested he might have

10  exaggerated that characterization and suggested that some of his other statements might have been

11  exaggerated.  (3/14/16 DeVries Decl., Ex. 2 (12/18/15 Boenke Depo. at 133:16-134:1, 136:13-21,

12  210:11-211:4, 224:17-25).)  Defendants also note that the 2/13/15 Assignment contained a

13  provision by which Mr. Boenke agreed to provide support to ChriMar with regard to "litigation

14  regarding, or for the purpose of defending the validity of or protecting title to the inventions,

15  applications, and/or patents, and to testify in support thereof[.]"  (2/3/15 Assignment at 1.)  The

16  record includes the original inventorship agreement, which does not contain a similar provision.

17  Mr. Boenke also testified that he located the original Inventorship Agreement after after he

18  testified in the Alcatel case and agreed it was possible that ChriMar was not aware that it still

19  existed.  (3/14/16 DeVries Decl., Ex. 2 (12/18/15 Boenke Depo. at 149:11-150:21, 153:2-12,

20  153:16-23, 154:5-6).)

21       When the Court views Mr. Boenke's testimony about the new assignments and the

22  payments to him and his son in the light most favorable to Defendants, Mr. Boenke's testimony

23  suggests that there is more than one explanation for ChirMar's conduct.  The record demonstrates

24  that there "multiple reasonable inferences that may be drawn" about ChriMar's intent as to both

25  the Austermann/Cummings Declaration and the Declaration and Power of Attorney.  Accordingly,

26  the Court GRANTS ChriMar's motion for summary judgment on the inequitable conduct

27  counterclaims.

28

United States District Court
Northern District of California

### 3.     The Unclean Hands Counterclaims.[9]

Defendants also seek a declaration that the '250 Patent is not enforceable because of ChriMar's unclean hands.  As set forth in *Therasense,* the *Keystone Driller, Hazel-Atlas*, and *Precision* cases "dealt with particularly egregious misconduct, including perjury, the manufacture of false evidence, and the suppression of evidence."  *Id.* at 1287; *see also Gilead Sci., Inc. v. Merck & Co.*, No. 13-cv-4057, 2016 WL 3143943, at *24-26 (N.D. Cal. June 6, 2016) ("*Gilead I*") (describing facts of each case).  The *Aptix* case also involved allegations that the patent holder manufactured evidence during the litigation.  269 F.3d at 1373.  In *Therasense*, the court reaffirmed that the "unclean hands doctrine remains available to supply a remedy for egregious misconduct like that in the Supreme Court cases."  649 F.3d at 1287.

In *Gilead I*, the plaintiff filed suit for a declaratory judgment of non-infringement and invalidity of the patents-in-suit.  When the defendant counterclaimed for infringement, the plaintiff asserted a defense of unclean hands.  2016 WL 3143943, at *3.  To support that defense, the plaintiff asserted that one of the defendant's patent attorneys, who was working on the same subject matter and who should have been subject to a company firewall, obtained confidential information from an entity with whom defendant was collaborating pursuant to a non-disclosure agreement (Pharmasset).  The plaintiff subsequently acquired Pharmasset and asserted, and the district court determined, that the defendant used the confidential information to write new claims targeting Pharmasett's work.  *Id.*, 2016 WL 3143943, at *6-11, *27-29.  The district court also found that the defendant's attorney lead participants in a conference call to believe that he was subject to the firewall.  The district court also found that the attorney lied, during his deposition and at trial, about his participation in a due diligence conference call, during which the patent was

---

[9]     Defendants argue their allegations regarding unclean hands "extend" to the allegations surrounding the alleged inequitable conduct.  (*See* Defs. Opp. Br. at 21 n.19.)  Defendants neither incorporated by reference the allegations regarding unclean hands into their counterclaims or affirmative defenses of inequitable conduct nor incorporated the latter allegations into the counterclaims and affirmative defenses of unclean hands.  (*See* HP Answer ¶¶ 16-19, 42-70; HP Counterclaim Count II, ¶¶ 52-56, 149-155; Cisco Answer ¶¶ 16-19, 42-70; Cisco Counterclaim Count III, ¶¶ 56-60, 120-126.)  Accordingly, the Court has limited its evaluation of unclean hands to conduct that occurred in connection with ChriMar's interactions with the IEEE.

United States District Court
Northern District of California

discussed, and lied about the reasons for writing new patent claims.  *Id.,* 2016 WL 3143943, at *12-17, *29-*32.

The district court imputed the attorney's acts to the defendant and concluded that any one of those acts – "lying, unethical business conduct, or litigation misconduct – would be sufficient to invoke the doctrine of unclean hands; but together, these acts unmistakably constitute egregious misconduct that equals or exceeds the misconduct previously found by other courts to constitute unclean hands." *Id.*, 2016 WL 3143943, at *27, *35.  The district court determined that the defendant's "acts are even more egregious because the main perpetrator of its misconduct was its attorney." *Id.*, 2016 WL 3143943, at *27, *32.  Accordingly, the district court determined that the defendant was barred from asserting the patents-in-suit against the plaintiff, but it did not rule that the patents-in-suit were unenforceable for all purposes.  *Id.*, 2016 WL 3143943, at *39.

The Federal Circuit affirmed, although on a "more limited set of wrongful conduct than recited in the district court's opinion." *Gilead II*, 888 F.3d at 1247 (citing 888 F.3d at 1242 n.4, 1243 n.5).  The Federal Circuit reasoned the attorney's misconduct, which it found was "clear," was sufficiently egregious to conclude that it amounted to "unclean hands." *Id.* at 1240-47.  The Federal Circuit also concluded that the misconduct had the "immediate and necessary relation" to the plaintiff's claims, in part, because it served to "enhance [defendant's] position regarding legal rights that are important to the litigation if the impropriety [was] not discovered and corrected." *Id.* at 1240.  For example, by obtaining the confidential information and narrowing the claims, the defendant was able to expedite prosecution of one of the patents and helped insulate the patent from prior art and other invalidity challenges. *Id.* at 1243-44.  Accordingly, the Federal Circuit upheld the district court's determination that the patents-in-suit could not be enforced against the plaintiff.

The parties do not address the standards set forth in the Supreme Court's trio of unclean hands cases or the standards in *Therasense*.  To resolve this motion, the Court must determine whether ChriMar's alleged misconduct before the IEEE would rise to the level of "egregious misconduct."  This case does not involve conduct that involves the manufacture or suppression of evidence during litigation.  Instead, Defendants argue that ChriMar comes to court with unclean

1    hands because it made affirmative misrepresentations to the IEEE and failed to disclose the '250

2    Patent or the '708 Application to the IEEE.

3         "By failing to disclose relevant intellectual property rights … to an SSO prior to the

4    adoption of a standard, a patent holder is in a position to hold up industry participants from

5    implementing the standard." *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1010 (Fed. Cir.

6    2008) ("*Qualcomm*") (quoting *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 310 (3rd Cir.

7    2007) ("*Broadcom*")).  The "hold up" occurs because it can become "prohibitively expensive [for

8    participants] to abandon their investment and switch to another standard." *Id.*  To avoid that

9    problem, "many SSOs require participants to disclose and/or give up" patent rights covering a

10   standard.  *Id.*; *see also Rambus Inc. v. Fed. Trade Comm'n*, 522 F.3d 456, 459 (D.C. Cir. 2008)

11   ("Before an SSO adopts a standard, there is often vigorous competition among different

12   technologies for incorporation into that standard.  After standardization, however, the dynamic

13   typically shifts, as industry members begin adhering to the standard and the standardized features

14   start to dominate.").  The Federal Circuit also concluded "that a district court may in appropriate

15   circumstances order patents unenforceable as a result of silence in the face of an SSO disclosure,

16   as long as the scope of [that] remedy is properly limited in relation to the underlying breach."

17   *Qualcomm*, 548 F.3d at 1026.

18        Taking the facts and all reasonable inferences therefrom in the light most favorable to

19   Defendants, the Court concludes that ChriMar's conduct during the IEEE proceedings, discussed

20   above in Background Section B, cannot be considered "particularly egregious" or

21   "unconscionable."

22        Accordingly, the Court GRANTS ChriMar's motion for summary judgment on the

23   counterclaims of unclean hands.

24   **B.      The Remaining Counterclaims.**

25        HP and Cisco assert counterclaims for breach of contract, and Cisco asserts counterclaims

26   for alleged violations of the Sherman Act and the UCL and a counterclaim for fraud.  ChirMar

27   moves for summary judgment and argues that Defendants cannot prevail on the merits of each

28   counterclaim.  In its opening brief, ChriMar argued that, as to Cisco, these affirmative defenses

United States District Court
Northern District of California

1    were time-barred.  Defendants cross-moved for summary judgment on that affirmative defense,

2    and in its reply ChriMar argues that HP's breach of contract counterclaim is time-barred as well.

3    (*Compare* ChriMar MSJ at 15:6-20:5 *with* ChriMar Opp. and Reply at 20:11-21:18.)

4         **1.      Breach of Contract.[10]**

5         In their counterclaims for breach of contract, Defendants contend they are third-party

6    beneficiaries of an express or implied contract between ChriMar and the IEEE.  In order to prevail

7    on their breach of contract counterclaims, Defendants must prove: (1) the existence of a contract;

8    (2) performance of the contract or excuse for non-performance; (3) breach; and (4) damage.  *See*

9    *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1388 (1990).  "The only

10   distinction between an implied-in-fact contract and an express contract is that, in the former, the

11   promise is not expressed in words but is implied from the promisor's conduct."  *Weitzenkorn v.*

12   *Lesser*, 40 Cal. 2d 778, 794 (1953).  ChriMar moved for summary judgment on an affirmative

13   defense that these claims were barred by the statute-of-limitations.  The Court does not reach that

14   issue because if the claims are timely, it concludes Defendants cannot prevail on the merits.

15        Defendants argue that the "express" contracts consist of the IEEE-SA Standards Board

16   Bylaws and Operations Manual (the "IEEE Policies") and ChriMar's Letter of Assurance.

17   According to Defendants, ChriMar and the IEEE would have formed contracts based on the IEEE

18   Policies at some point between 2000 and 2005, by way of ChriMar representatives' attendance at

19   the IEEE meetings.  It is undisputed that ChriMar executed the Letter of Assurance in 2001.

20   Defendants do not clearly articulate their theory regarding the implied contract, but their

21   overarching theory suggests the implied contract is based on IEEE members' and participants'

22   understanding that they had an obligation to disclose patents or patent applications, if they

23   contained claims that could read on a proposed standard.

24        Under either theory, Defendants must show that ChriMar was required to disclose its

25   _____

26   [10]      The parties did not engage in a choice of law analysis, but Defendants argue California law
     should apply because they are California corporations.  The record shows the IEEE is located in
27   New York.  ChriMar cited California law in its opening brief, and in reply chooses not to engage
     in a choice of law analysis.  Accordingly, the Court will apply California law to the fraud and
28   breach of contract counterclaims.

United States District Court
Northern District of California

patents and/or patent applications and failed to do so.  In *Norman IP Holdings, LLC v. Lexmark, International, Inc.*, the district court considered a breach of contract claim based on the IEEE Policies at issue in this case.  No. 11-cv-495-LED-JDL, 2014 WL 12600274 (E.D. Tex. Feb. 28, 2014).  In that case, Volkswagen Group of America, Inc. ("VW") filed a third-party complaint against the plaintiff and alleged the plaintiff breached a contract with the IEEE by failing to disclose a patent during a standard setting process.  *Id.*, 2014 WL 12600274, at *1.  The plaintiff moved to dismiss VW's breach of contract claim.

The *Norman* court determined that the IEEE SA Standards Board bylaws did not include a requirement that a patent holder was obliged or required to disclose any patents.  It construed the relevant language to "address how IEEE may create standards which include the known use of patent(s)."  *Id.*, 2014 WL 12600274, at *3.  The court also determined that the relevant portion of the operations manual "imposes no duty on any patent holder, though it 'encourages early disclosure to the working group of patent information that might be relevant.'"  *Id.* (quoting operations manual, attached as exhibit to the complaint).  Finally, the court determined that the only obligation imposed by Section 6.3.2 was on the "sponsor chair" who was required to ask known patent holders to submit a statement.  *Id.*  Therefore, the court granted the plaintiff's motion to dismiss.

The Court has considered the language of the IEEE Policies at issue and, like the *Norman* court, concludes they do not include an express duty to disclose.  That does not end the inquiry because Defendants also rely on an implied-in-fact contract.  In *Rambus Inc. v. Infineon Technologies AG*, the defendant alleged that the plaintiff's failure to disclose patents in violation of a standard setting organization's policies ("JEDEC") amounted to fraud.  318 F.3d 1081, 1096 (Fed. Cir. 2003).  The Federal Circuit examined the policies at issue to determine whether the defendant breached any duty of disclosure.  It determined that the only policy shown to members stated that: (1) "[s]tandards that call for the use of a patented item or process may not be considered by a JEDEC committee unless all of the relevant technical information covered by the patent or pending patent is known to the committee, subject, or working group[;]" and (2) that the patentee or applicant agreed to a license "for the purpose of implementing the standard(s)."  318

United States District Court
Northern District of California

F.3d at 1097-98.  The court determined that language did not actually impose a duty of disclosure.  Because there was evidence to show members treated the language as imposing a duty of disclosure, the court assumed that a duty to disclose existed.  However, it concluded that duty "extended only to claims in patents or applications that reasonably might be necessary to practice the standard."  *Id.* at 1099-1100, 1102.

Defendants have put forth evidence that, in general, members of the IEEE understood that if they participated in a standard setting process and if the standard might cover information in a patent or patent application, they would be expected to disclose those patents or patent applications.  (*See, e.g.,* 5/13/16 DeVries Decl., ¶ 37; Dkt. No. 393-37, 5/13/16 DeVries Decl., Ex. 36 (Deposition of Chad Jones, April 24, 2012 at 177:1-16).)  There also is evidence that ChriMar was aware that if it wanted to participate in IEEE meetings, it would be required to disclose patents and/or patent applications that could potentially read on the standard.  The best evidence of this understanding is the fact that it executed a Letter of Assurance in December 2001 with respect to the '260 Patent.  However, ChriMar argues that the claim language it contends reads on the IEEE standards did not exist until 2008.  (*See* 4/29/16 Jordan Decl., ¶ 29; Dkt. No. 379-30, 4/29/16 Jordan Decl., Ex. BB (Excerpt of prosecution history).)  By that time, there is no evidence that ChriMar was still involved in the standard setting process.  Therefore, the Court concludes that no reasonable jury could find ChriMar breached any contractual duty it may have owed to the IEEE.  *Cf. Infineon*, 318 F.3d at 1102 (finding that patent policy at issue did not require "disclosure of a member's intentions to file or amend patent applications").

Accordingly, the Court GRANTS ChriMar's motion for summary judgment on Defendants' breach of contract counterclaims.

### 2.    Cisco's Fraud Counterclaim.

Cisco's fraud claim also is based on ChriMar's alleged failure to disclose the '708 Application and the '250 Patent to the IEEE.  The essential elements of a fraud claim under California law are "(1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, *i.e.*, to induce reliance; (4) justifiable reliance; and (5) resulting damage."  *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 990

United States District Court  
Northern District of California

1   (2004).  The parties agree that Cisco's fraud claim is subject to a three-year statute of limitations.

2   Cal. Civ. Code § 338(d).  Further, a fraud claim "is not deemed to have accrued until the

3   discovery, by the aggrieved party, of the facts constituting the fraud or mistake."  *Id.*  Cisco filed

4   its original counterclaim on January 6, 2012.  Therefore, Cisco must show that the claim did not

5   accrue until at least January 6, 2009, or must show that there is a basis to toll the statute of

6   limitations.

7        "In ordinary tort and contract actions, the statute of limitations, … begins to run upon the

8   occurrence of the last element essential to the cause of action.  The plaintiff's ignorance of the

9   cause of action, or of the identity of the wrongdoer, does not toll the statute."  *Neel v. Magana,*

10  *Olney, Levy, Cathcart & Gelfand*, 6 Cal. 3d 176, 187 (1971), *superseded by statute on other*

11  *grounds*; *see also Aryeh v. Canon Bus. Solutions, Inc.*, 55 Cal. 4th 1185, 1191 (2013).

12       ChriMar executed the IEEE's form Letter of Assurance regarding the '260 Patent on

13  December 3, 2001, during the development of Standard 802.3af.  Cisco argues that ChriMar

14  engaged in fraud because it failed to disclose the '708 Application in the Letter of Assurance and,

15  by doing so, also failed to disclose the '250 Patent.  It is undisputed that the '708 Application was

16  not published until 2004.

17       Cisco argues it was not harmed until ChriMar filed this lawsuit.  Yet, this claim also is

18  based on the alleged failure to disclose the '708 Application of the '250 Patent to the IEEE.  Cisco

19  contends that the harm they, and others, allegedly suffered from that failure is that that IEEE

20  Standards were ratified using technology that ChriMar alleged reads on the '250 Patent.  That

21  harm would have occurred at the time the standards were ratified.  (*See, e.g.*, 4/29/16 Jordan Decl.,

22  ¶ 24; Dkt. No. 380-16, 4/29/16 Jordan Decl., Ex W (Deposition of Chad Jones at 38:5-40:2, 41:14-

23  43:20 (discussing view that "damage can't be repaired if there's an IP claim" once standard is

24  ratified).)  Standard 802.3af was ratified in 2003, and Standard 802.3af was ratified in 2009.

25       Cisco also argues it had no way to discover the alleged breach until 2011.  On August 19,

26  2005, Cisco and ChriMar entered into a license agreement regarding the '260 Patent, which

27  resolved a separate lawsuit.  ChriMar took the position that Standard 802.3af read on the claims of

28  the '260 Patent.  That license that included a provision by which ChriMar agreed to a limited

United States District Court
Northern District of California

28

United States District Court
Northern District of California

covenant not to sue Cisco for "infringement (direct, contributory, or inducement) of U.S. Patent No. 6,650,622 and any patent that may issue from U.S. Application No. 10/668,708 for a period of two years from the Effective Date of this License Agreement[.]" (4/29/16 Jordan Decl., ¶ 27; Dkt. No. 380-19, Jordan Decl., Ex. Z (License Agreement).)

By at least August 2005, Cisco had facts that, in the exercise of reasonable diligence, could have put it on notice that ChriMar had failed to disclose the '708 Application to the IEEE and also had failed to disclose its position on licensing the technology embodied in that application. The Court also concludes that Cisco has failed to put forth evidence to show there are genuine issues of material facts in dispute on this issue. Although it puts forth testimony that ChriMar may have made representations that it did not believe Cisco infringed the '622 Patent, it did not put forth any evidence that ChriMar made similar representations regarding the claims set forth in the '708 Application or the '250 Patent. (See 5/13/16 DeVries Decl., ¶ 65; Dkt. No. 393-57, 5/13/16 DeVries Decl., Ex. 64 (Deposition of Monte Cooper at 20:2-10).)

The Court concludes that with respect to ChriMar's conduct relating to Standard 802.3af, the fraud counterclaim is time-barred, and it GRANTS, IN PART, ChriMar's motion for summary judgment on that basis and DENIES Cisco's cross-motion on the statute-of-limitations defense. Although Standard 802.3at was ratified in 2009, as discussed above, ChriMar argues that the claim language it contends reads on the IEEE standards did not exist until 2008. (See Jordan Decl., Ex. BB (Excerpt of prosecution history).) By that time, there is no evidence that ChriMar was still involved in the standard setting process. For those reasons, the Court GRANTS, IN PART, ChriMar's motion for summary judgment on Cisco's fraud claim.

### 3.     Cisco's Sherman Act Counterclaim.

Cisco alleges that ChriMar violated Section 2 of the Sherman Act, which makes it illegal for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of . . . trade or commerce." 15 U.S.C. § 2. ChriMar alleges that Cisco cannot prove essential elements of its claim and contends that the claim is barred by the statute of limitations.

The parties agree that a claim for a violation of the Sherman Act must be "commenced

29

within four years after the cause of action accrued." *See* 15 U.S.C. § 15b.  In general, a Sherman Act claim accrues when "a defendant commits an act that injures a plaintiffs' business." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971); *see also Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1062 (N.D. Cal. 2016).  Thus, Cisco must be able to show that its Sherman Act counterclaim accrued on or after January 6, 2008, or must show that the statute of limitations was tolled.

As with its fraud counterclaim, Cisco alleges that it was not injured until ChriMar filed this lawsuit and, thus, the counterclaim is timely.  For all the reasons set forth above in connection with the fraud claim, the Court concludes that Cisco's Sherman Act claim fails.

Accordingly, it GRANTS ChriMar's motion for summary judgment on that claim, and it DENIES Cisco's cross-motion for summary judgment on the statute-of-limitations defense.

### 4.     The UCL Counterclaim.

Finally, ChriMar argues it is entitled to summary judgment on the UCL counterclaim on the merits and because the claim is barred by the statute of limitations.  The parties agree that the statute of limitations for the UCL claim is four years from the date the claim accrued.  The parties also repeat the arguments raised in connection with the other counterclaims claims as to when the claim accrued.  For the same reasons the Court has determined Cisco's fraud and Sherman Act claims fail, the Court concludes the UCL counterclaims fails.  Therefore, ChriMar is entitled to summary judgment on this counterclaim as well.

### CONCLUSION

For the foregoing reasons, the Court GRANTS, IN PART, AND DENIES, IN PART ChriMar's motion for summary judgment, and it DENIES Defendants' cross-motion for summary judgment on ChriMar's statute of limitations defense.

**IT IS SO ORDERED.**

Dated: December 17, 2019

*Nunc pro tunc to* November 25, 2019

_____
JEFFREY S. WHITE
United States District Judge

United States District Court
Northern District of California